**In re Matthew E. COLLINS, Julie E. Collins, Debtors.**

**Matthew E. and Julie E. Collins, Plaintiffs,**

v.

**Educational Credit Management Corporation, and the Educational Resources Institute, Inc., Defendants.**

**Bankruptcy No. 06–30822.**
**Adversary No. 06–3492.**

United States Bankruptcy Court, D. Minnesota.

Oct. 1, 2007.

David G. Keller, Grannis & Hauge, Eagan, MN, for Debtors/Plaintiffs.

## ORDER FOR JUDGMENT

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter came before the Court for trial on the debtors' complaint seeking discharge of student loans pursuant to 11 U.S.C. § 523(a)(8). David G. Keller appeared on behalf of the plaintiffs, debtors Matthew and Julie Collins. Henry T. Wang and A.L. Brown appeared on behalf of defendant Educational Credit Management Corporation (ECMC).[1] At the conclusion of the trial, the Court took the matter under advisement. Based upon all of the files, records and proceedings herein, the Court being now fully advised makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

## I. FINDINGS OF FACT

Debtor Matthew Collins is a doctor of chiropractic (D.C.). Collins obtained his D.C. and B.S. degrees, following completion earlier of an Associates of Arts degree, in 1999 from Northwestern College of Chiropractic. Soon thereafter, he passed his board exams and became a licensed chiropractor in Minnesota. In

---

1. This proceeding as it relates to defendant The Education Resources Institute, Inc. (TERI), has already been determined and concluded on stipulation between the parties, as noted in the case file.

2004, Collins successfully completed a rehabilitative chiropractic certification program and become one of only fifteen chiropractors in Minnesota holding the certified diploma from the American Chiropractic Rehabilitation Board in that specialty care area. Collins financed his education largely through student loans, which he consolidated following graduation. At the time of trial, his outstanding student loan debt was approximately $117,074.53, plus daily interest of $22.86 (about $685 every month).

Since earning his D.C. in 1999, Collins has remained employed, usually relatively lucratively, as a doctor of chiropractic. He began as a solo and relief practitioner, and then took an associate position at a well established chiropractic practice known as Snelling Chiropractic Clinic. He earned $54,600 annually plus commissions as an employee from 2000–2002, and then he purchased the practice. Collins operated the Snelling clinic until it failed and ceased operations in 2006. During those years, Collins and his wife reported adjusted gross income of $64,330 (2002), $28,250 (2003), $49,744 (2004), $58,256 (2005), and $52,429 (2006).[2]

Following the demise of Snelling Chiropractic, Collins worked full time as an associate chiropractor, from March 2006 through January 2007, for Premier Health Services. His annual salary there was $50,000 before commissions. He was fired at the end of January 2007, but within three weeks he had entered into an agreement with chiropractic offices known as Vital Injury and Wellness to operate a solo practice there at a cost of 25% gross receipts for rent and overhead, plus a 2% provider tax. So far, his gross receipts as a solo practitioner have been $2,531 (March); $2,976 (April); $3,995 (May); and $3,560 (June). Accordingly, his take home pay, not including income or employment taxes or expenses associated with trying to market and grow the practice, recently ranges from $1,848 to $2,916 per month, and mostly reflects steadily increasing receipts.

Collins is just 33 years old and in good health. His wife, Julie, is 30 years of age and also in good health. Neither suffers from any condition prohibitive of an ability to work. The Collins have three healthy children, ages 5 years, 2½ years, and 6 months. Julie works one day a week, but otherwise spends her time caring for the children. The family rents a two bedroom town home from Julie's father at cost, and makes payments to him on a loan for one of their cars,[3] as well. The Collins are apparently $6,505 behind on rent, and also owe Julie's father for the $5,000 retainer plus accruing fees for counsel in this proceeding. Julie graduated from the University of Iowa with a degree in sports health studies. She too had student loans, but they have been satisfied by her father.

2. The business apparently failed because, when the original proprietor sold the practice to Collins and left the operations, the injury referrals to the clinic also ceased. Collins was purportedly unable to adequately advance his own reputation to secure those referral sources, or was unable to otherwise restore former revenues. However, tax returns illustrate a somewhat different situation and indicate major losses only during the initial takeover and for the following year. Snelling reported total income in 2002 (Sept–Dec) of $41,529 and income after costs of - $28,114; $191,503/$8,010 in 2003; $282,170/$46,525 in 2004; and $248,812/$30,334 in 2005. While gross revenues generally increased over time, substantially from 2002–2004, costs appear to have advanced much more rapidly.

3. The Collins own outright a 1997 Oldsmobile with in excess of 220,000 miles, and make payments to Julie's father on a 1999 Dodge Caravan with approximately 120,000 miles.

The Collins claim the following essential monthly expenses of $4,609.00:

| | |
|---|---|
| rent | $1083 |
| association (trash removal, water/sewer, exterior maintenance) | $ 210 |
| utilities | $ 201 |
| telephone | $ 35 |
| home repair | $ 27 |
| food and sundry daily supplies | $ 800 |
| clothing | $ 100 |
| laundry/dry cleaning | $ 30 |
| rent insurance | $ 35 |
| life insurance | $ 116 |
| health insurance | $ 718 |
| non-covered medical/dental | $ 75 |
| health savings account | $ 241 |
| car insurance | $ 110 |
| transportation-gasoline only | $ 250 |
| car payment | $ 200 |
| car maintenance and repairs | $ 32 |
| TERI student loan payment | $ 50 |
| internet service & | $ 58 |
| malpractice insurance | $ 117 |
| 15.9% self employment tax (amount unknown/ uncertain) | .... |
| continuing education (expense based on $500/ year for 20 credits) | $ 42 |
| chiropractic license renewal fee ($200/year) | $ 17 |
| rehabilitation certificate renewal expenses ($140/ year plus $1200 conference every other year) | $ 62 |

Julie has not sought full time work outside caring for the children because the cost of full time daycare for all three children would be $665 weekly. The Collins do not believe that Julie could net more than the $35,000 annual daycare expense to the extent necessary to make it worthwhile. In the past, Julie has worked at part time, $7/hour fitness expertise related positions, such as a personal trainer. She has also worked through temp agencies performing data entry, as well as providing administrative and bookkeeping services for her husband in the chiropractic business. Her current one-day-a-week job is as a receptionist.

Collins claims that his historical income demonstrates perpetual lack in meeting his family's minimal costs. He opines that the industry of chiropractic practice is in decline and that a career therein is increasingly difficult to successfully initiate and sustain. In sum, Collins claims that his ability to supply his family's basic needs is severely compromised now and for the foreseeable future such that requiring repayment of his student loan debt to ECMC will constitute an undue hardship.

In fact, the field of chiropractic is not in decline. State of Minnesota projections indicate a 30.4% increase from 2004 to 2014, which is more than double the growth rate for all occupations in general. A median reasonable income to expect of Collins today with his education and experience is $65,000 annually,[4] whether as a solo practitioner or in a group. In a group, Collins is certain to earn more both at the outset and sustained over time. At the time of trial, there were no less than four associate chiropractor positions in group practices available in the Twin Cities, as well as one nearby in Wisconsin, none of which Collins had discovered or pursued. Moreover, his credentials make viable a career outside of chiropractic in related health fields such as, for example, fitness and health club management, or medical equipment sales.[5]

4. The reasonable annual salary expectation of $65,000 for Collins is based on a level 2 practitioner placement, just a step above entry-level (which earning expectation would be $54,000 annually), and does not account for his advanced and uncommon rehabilitation certification, which increases his available billable services and adds value to his marketability.

5. Income in such fields is typically commission driven, but in addition to generous guar-

Collins claims that he has brought this complaint in good faith, consistent with his ever attendant cognizance of keeping costs to a minimum throughout his education, within his family, and in his chiropractic practice. He claims that the capitalizing interest on the student loans and his inability to repay the loans will result in an eternal negative amortization and inescapable compromised credit. ECMC contends that Collins has strong earning capacity, now and going forward, and that the availability of the Income Contingent Repayment Program will safely escort Collins and his family through this difficult financial period until their situation improves.

## II. DISCUSSION

Section 523(a)(8) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—

(A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986,

incurred by a debtor who is an individual.

*See* 11 U.S.C. § 523(a)(8).

Dischargeability of student loans under § 523(a)(8) is a well developed area of law in the Eighth Circuit. Under the totality of the circumstances test, "the court considers (1) the debtor's past, present and future financial resources, (2) the debtor's reasonable and necessary living expenses, and (3) any other relevant circumstances." *See In re Reynolds*, 425 F.3d 526, 529 (8th Cir.2005). The burden of proving undue hardship lay with the debtor, by a preponderance of the evidence. *Id.*

"Each bankruptcy case involving a student loan must be examined on the facts and circumstances surrounding that particular bankruptcy for the Court to make a determination of 'undue hardship.'" *Reynolds*, 425 F.3d at 531, citing *Andrews v. S.D. Student Loan Assistance Corp.*, 661 F.2d 702, 704 (8th Cir.1981); quoting *In re Wegfehrt*, 10 B.R. 826, 830 (Bankr.N.D.Ohio 1981). "The bankruptcy court must determine whether there would be anything left from the debtor's estimated future income to enable the debtor to make some payment on his/her student loan without reducing what the debtor and his/her dependents need to maintain a minimal standard of living." *Id.*

"Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged." *Reynolds*, 425 F.3d at 532, citing *In re Long*, 322 F.3d 549, 554–555 (8th Cir.2003). "Certainly, this determination will require a special consideration of the debtor's present employment and financial situation—including assets,

anteed base salaries similar to those in the      chiropractic environment.

expenses, and earnings—along with the prospect of future changes—positive or adverse—in the debtor's financial position." *Id.*

■ "[A] court must consider a spouse's income in deciding whether a student loan constitutes an undue burden." *See In re Sweeney,* 304 B.R. 360, 362 (D.Neb.2002). "For reasons of sound authority and sound public policy, the court must view undue hardship in light of the total income of the family." *Sweeney,* 304 B.R. at 363.[6] Likewise, the earning capacity of an unemployed spouse is a relevant inquiry.

■ Looking strictly at the current expenses and income of the Collins family, and assuming for the moment that the claimed expenses are reasonable and necessary, there is an appearance of a very significant negative monthly cash flow and no surplus from which to fund any payment against the student loan debt. Undue hardship has been found on lesser scales.[7] However, this case is unique because of the compelling element of earning capacity. Matthew Collins has excellent earning capacity. Julie Matthews is also not without earning capacity, regardless of her primary role as full time care provider of the three Collins children.

■ "[S]ignificant earning capacity [is] a fact which the Court must consider in the undue hardship analysis." *See In re Winsborough,* 341 B.R. 14, 18 (Bankr. W.D.Mo.2006), citing *Weller v. Texas Guaranteed Student Loan Corp. (In re Weller),* 316 B.R. 708, 716 (Bankr.W.D.Mo. 2004) (Court must look beyond the debtor's present to the foreseeable future and consider debtor's education, training, employment history and ability to earn); *Chapelle v. Educational Credit Mgmt. Corp. (In re Chapelle),* 328 B.R. 565, 571–72 (Bankr.C.D.Cal.2005) (Court declines to discharge student loan debt where debtor has a law degree, is healthy and has 13 years before retirement age during which she has the potential to secure employment and make payments on her student loans).

At trial, Collins made much of the failure of his operation of Snelling Chiropractic and repeatedly claimed it as evidence of an irreparably damaged poor work experience record and ultimately of his "low" earning capacity. Indeed, there were significant losses associated with the initiation of that venture, and some level of loss incurred each year and through the collapse. But, such numbers are relative matters. Even taking into account that tax returns failed to realistically account for all the legitimate expenses of the business, such as principal payments on busi-

---

**6.** "Overwhelming authority requires that a court consider the spouse's income." *Sweeney,* 304 B.R. at 362–363. "The court in *White v. United States Department of Education, et al.,* 243 B.R. 498 (Bankr.N.D.Ala. 1999) cites no less than forty-nine (49) cases in which courts have held that a court must consider the earnings of both the debtor and his spouse in evaluating whether a student loan creates an undue hardship." *Sweeney,* 304 B.R. at 363, citing *White,* 243 B.R. 498 at n. 9.

**7.** See, e.g., *Sweeney,* 304 B.R. at 365 (4 children and total family monthly income of

$3,350 and a student loan debt of over $45,000 constitutes undue hardship), citing *In re Cline,* 248 B.R. 347 (8th Cir. BAP 2000) (no children/not married; $1,578 monthly income; $53,500 student loans); *In re Coats,* 214 B.R. 397 (Bankr.N.D.Okla.1997) (3 children; $4,218 monthly income, including social security and child support; $39,000 student loans); *In re Skaggs,* 196 B.R. 865 (Bankr.W.D.Okla.1996) (3 children; $3,000 monthly income; $47,000 student loans); and *In re Cooper,* 167 B.R. 966 (Bankr.D.Kan. 1994) (3 children; $2,600 income; $9,000 student loans).

ness loans for example, gross receipts and individual adjusted gross income overwhelmingly reflect substantial sums—revenue and income surely out of reach of almost all "garden variety" debtors.

Perhaps Collins was too much a novice at business when he took on Snelling. Perhaps he was inexperienced and ineffective at marketing himself and mistakenly relied upon the long established reputation of the practice he purchased. Perhaps he made many mistakes. However, it does not appear that Collins erred as a chiropractor. He continued throughout operation of Snelling to generate revenue, he quickly found full-time salaried replacement work at Premier when the Snelling enterprise failed, and he just as quickly established a solo practice when the Premier group let him go. That is not to say that Collins' financial situation at the time of filing and at the present time is not difficult and troubling. But, the current financial burden is temporary for the Collins family, a "bump in the road," as ECMC put it. The general discharge will provide the necessary fresh start, and a combination of belt tightening and income maximization will provide a substantial opportunity for full financial rehabilitation in due time.

The Court rejects the argument that Collins has a history of inadequate earning capacity. While it may be true that he has not always managed to fund his family's basic annual expenses of more than $55,000 net, he has nevertheless grossed approximately $50–65,000 almost every year (except 2003 and this year) since he began working as a chiropractor. Moreover, the field of chiropractic is prosperous and growing in Minnesota, contrary to his assertions at trial. And, Collins has a specialty that only fourteen other chiropractors in Minnesota also offer, and there are multiple associate positions in group practices, which are more lucrative, available in the local community. Collins has also not adequately explored alternative careers appropriate to his education, and instead has voluntarily selected the road most difficult, time consuming, and costly, the solo practice.

While the Court takes no position with respect to family choices such as size and child care, there was no evidence proffered that Julie Collins has exhausted her earning capacity. At the present time, Matthew Collins commits approximately 28 hours each week to actually seeing patients, and purportedly devotes up to another 37 hours each week managing his solo practice and attempting to market it. He makes himself available one shift a week to babysit while Julie works as a receptionist. Presumably different choices could be made now to enable Julie to work out of the home on weekends or evenings, or in some capacity while at home.

Barring such arrangements and the high cost of day care for three small children, the situation will naturally change in the coming years: the oldest child will go to school full days next year, the middle child in four years, and the youngest in six years, with each transition rendering child care more affordable and full-time work for Julie an ever nearer possibility. She will be just 36 years old when her youngest child heads off to first grade. There is no indication in the record that she is now or will be in the future compromised from obtaining gainful employment. She is college educated and has experience both in her field of study as well as in various office management and support functions.

The discussion of this case is not complete without consideration of the expenses claimed. At a glance, there are no luxury or similarly suspect, questionable items. However, there are a great many expenses related to Collins as a chiropractor, and in

particular to his status as a solo practitioner, that may be substantially reduced (or possibly eliminated as a net family expense) if he either joined a group practice or sought alternative employment. Sizeable self employment tax is not even an actual figure in the current expense calculation, and as it stands many major expenses often part of an employment package are currently being funded by Collins individually.

While the line by line review of family expenses is not particularly offending, the monthly sum total is quite steep, even for a family size of five.[8] The Collins maintain numerous expenses that most ordinary family debtors manage for considerably less (food, housing and utilities, clothing, gasoline), or simply do without (health savings account). Were earning capacity not the controlling circumstance in this case, the Court would be inclined to evaluate the expenses much more precisely and thoroughly. However, the Court finds that the Collins' earning capacity is or will soon be sufficient to meet and likely exceed actual basic needs, and will eventually be adequate to meet or exceed the full claimed expenses as well.

■■■ "[T]he availability of the ICRP is 'but one factor to be considered in determining undue hardship, but it is not determinative.'" *See In re Lee*, 352 B.R. 91, 95 (8th Cir. BAP 2006), citing *In re Korhonen*, 296 B.R. 492, 496 (Bankr.D.Minn. 2003); *In re Thomsen*, 234 B.R. 506, 509–10 (Bankr.D.Mont.1999). "Placing too

much weight on the ICRP would have the effect in many cases of displacing the individualized determination of undue hardship mandated by Congress in § 523(a)(8) [because] the payments on a student loan will almost always be affordable, i.e., not impose an undue hardship on a Debtor." *Lee*, 352 B.R. at 95–96.[9]

■■■ "[T]he availability and terms of the ICRP should not be given undue weight under the totality of circumstances analysis because it serves a fundamentally different purpose than the discharge provisions (and exceptions thereto) of the Bankruptcy Code." *Lee*, 352 B.R. at 96. "A survey of the legislative history behind legislation related to the ICRP indicates that its primary goal is to assist borrowers in avoiding default." *Id.*, citing S. Rep. 102–447, at 371–72 (1992); H. Rep. 103–111, at 158 (1993); H. Rep. 109–231, at 141 (2005). "In contrast, the Bankruptcy Code serves to provide a fresh start to 'honest but unfortunate debtors,' most of whom have already defaulted on their obligations (including student loans)." *Lee*, 352 B.R. at 96. "The ICRP provides temporary relief from the burden of a student loan, but it does not offer a fresh start." *Id.* at 97. *See also, In re Cumberworth*, 347 B.R. 652, 660–661 (8th Cir. BAP 2006).

Collins has declined the ICRP because of the negative amortization resultant from nonpayment or small payments for an extended period of time concurrent with substantial capitalizing daily interest accrual in excess of principal reduction. He also

---

8. The poverty level for a family of five is just under approximately $24,130, or less than half the $55,308 net annual expenses claimed by Collins.

9. "[A] key difference between the ICRP and the undue hardship inquiry under § 523(a)(8) ... is that they employ different standards for measuring a debtor's ability to pay." *Lee*, 352 B.R. at 96. "Under the ICRP, a debtor is

presumed to have the ability to pay 20% of the difference between her adjusted gross income and the poverty level for her family size, or the amount the debtor would pay if the debt were repaid in twelve years, whichever is less." *Id.* "In contrast, a bankruptcy court engages in a case-by-case analysis of a debtor's income in relation to her reasonable expenses."

complains that his income to debt ratio while remaining obligated on his student loans will render him credit unworthy and cause him suffering in the credit consumer driven marketplace and business environment. In some cases, those are very powerful arguments, completely appropriate and ultimately effective. This is not such a case.

Under the ICRP, based on household size of five and 2006 adjusted gross income of $52,429, Collins' required income-based monthly payment on his student loans would be $471.65. Based on his current income, the required payment would be nothing. According to Collins' current claimed expenses, there would be no funds to make the $471.65 even if his current income was $52,429. But, the Court is not persuaded that the expenses have been adequately mitigated. The Court is convinced that the Collins family earning capacity does exceed or will soon exceed actual expenses. If family revenues remain low, so too will the ICRP payment. As family income rises and the required minimum ICRP payment rises, Collins will have the means to afford the ICRP payment without undue harm to himself or his dependents.

The income to debt ratio occasioned by the student loans is also not so much of a problem because the Collins have had all other debts discharged as a result of the bankruptcy. Besides ordinary expenses, Collins has no debt but for one small car payment, and no mortgage. Therefore the student loan balance is not so burdensome on Collins' overall credit. In addition, participation in the ICRP is designed to assist the borrower in remaining out of default status, a necessity for maintaining good credit. Besides the established poverty level schedule of income-based payment formulation under the ICRP, there is also an avenue to submit "special cir-

cumstances" by which to request reduced payments, and nonpayment deferment or forbearance periods which constitute a "current" repayment status are also available.

Collins argues that, should he participate in the ICRP and be granted forgiveness of any remaining loan balance at the conclusion of the 25 year life of the payment plan, he will then suffer debilitating income tax consequences. While the question of whether loan cancellation at the end of an ICRP term is always a taxable event or subject to a solvency requirement has yet to be conclusively determined in this context, it is of no moment here because the Court cannot reasonably countenance Collins participating in the ICRP to such an end. Instead, it is more plausible that Collins will entirely satisfy and retire the debt at sometime prior to the end of his ICRP term, should he decide to select that repayment program after all.

Interestingly, in closing at trial, ECMC unexpectedly stipulated to allow Collins an unrestricted period of two years (presumably from the date of this decision) during which no payments would be required and no interest or fees would accrue. In other words, ECMC unilaterally agreed that, for two years, Collins' total outstanding loan balance would be stayed. The rationale for this apparently generous alteration in terms was not in concession, but simply strategic: ECMC proceeded on the basis of this changed circumstance to argue that the Court was thereby compelled to shift the undue hardship determination two years forward.

The Court is not inclined to allow counsel to make fractious attempts to interfere with the analysis in this manner. The law on § 523(a)(8) is perhaps someways controversial, and can be factually difficult depending on the case, but it is fairly well settled nonetheless. In any event, a core

part of the assessment is looking ahead to a debtor's reasonable future earnings. Two years ahead is already part of the evaluation. At best, by staying payments and fees, the creditor is inserting into the factual circumstances a certain and non-contingent provision of temporary relief, and raising the question of whether such a transitory escape from the debt increases or decreases its otherwise burdensome qualities. In the present case, that question is entirely irrelevant because the outcome of this proceeding would be the same regardless of the two year freeze, though surely the Collins are no doubt pleased by the unqualified last-minute extended reprieve.

This case presents precisely the sort of debt the discharge of which § 523(a)(8) was designed to preclude. Collins is young, healthy, highly educated, and accomplished and experienced in a successful, growing and lucrative career field. He has demonstrated a consistent ability to earn a large income. He has worked continuously as a doctor of chiropractic since he entered the work force as such, and there is no reason to suspect he will not maintain a steady and increasing practice going forward and generate a rising income, especially if he goes to a group practice.

Similarly, Julie Collins is young, healthy, college educated, and adequately and variously experienced such that she will be able to secure work befitting her schedule preferences and eventually worthy of her full time when the children are all in school. Having now the benefit of a general discharge of debts, the Collins have the fresh start they need, within which they have a new chance to maximize the opportunities afforded by the strong earning capacities just described. Under these circumstances, the Court must reasonably conclude that repayment of the student loan debt to ECMC will not constitute an undue hardship upon the debtors or dependents of the debtors.

### III. DISPOSITION
IT IS HEREBY ORDERED:

1. The student loan debts of Matthew E. Collins owing to creditor Educational Credit Management Corporation (ECMC), in the approximate amount of $117,074.53 plus interest, do not constitute an undue hardship pursuant to 11 U.S.C. § 523(a)(8), and are accordingly nondischargeable and are excepted from the general discharge entered in main case BKY 06–30822.

LET JUDGMENT BE ENTERED ACCORDINGLY.