# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 09-6022

_____

|  |  |  |
|---|---|---|
| In re: Michele D. Walker, | * | |
| | * | |
| Debtor | * | |
| | * | |
| Michele D. Walker, | * | |
| | * | |
| Plaintiff - Appellee | * | Appeal from the United States |
| | * | Bankruptcy Court for the |
| v. | * | District of Minnesota |
| | * | |
| Sallie Mae Servicing Corp., | * | |
| SLM Education Credit Finance | * | |
| Corporation, | * | |
| Zwicker & Associates, P.C., | * | |
| Kohn Law Firm, S.C., and | * | |
| Sallie Mae, Inc., | * | |
| | * | |
| Defendants | * | |
| | * | |
| Educational Credit Management | * | |
| Corporation, | * | |
| | * | |
| Defendant - Appellant | * | |

_____

Submitted: February 24, 2010
Filed: April 9, 2010

_____

Before SCHERMER, FEDERMAN, and SALADINO, Bankruptcy Judges

FEDERMAN, Bankruptcy Judge

Educational Credit Management Corporation appeals from the Order of the Bankruptcy Court[1] finding Debtor Michele D. Walker's student loans to be dischargeable as an undue hardship pursuant to 11 U.S.C. § 523(a)(8). For the reasons that follow, we AFFIRM.

## I. PROCEDURAL BACKGROUND

Debtor Michele D. Walker filed a Chapter 7 bankruptcy petition on April 2, 2004, and received her discharge on July 12, 2004. Three years later, on August 15, 2007, she filed an adversary proceeding seeking to discharge $300,000 in student loan debt as an undue hardship under § 523(a)(8) of the Bankruptcy Code. The Bankruptcy Court conducted a trial on May 19, 2008, and issued its Judgment and Memorandum Opinion on June 18, 2009, finding that requiring Michele to repay her student loans would impose an undue hardship on her and her dependents and, therefore, the student loans were dischargeable under § 523(a)(8). ECMC appeals.[2]

## II. FACTUAL BACKGROUND

In its Memorandum Opinion, the Bankruptcy Court made extensive findings as to the circumstances surrounding Michele's incurring the student loans, as well as her current family situation. We need not repeat all of those facts in such detail here. To summarize, however, Michele received her bachelor's degree in 1989, and then attended medical school in the hopes of becoming a psychiatrist, but was unable to pass the boards and was dismissed from medical school in 1995. After working for

---

[1] The Honorable Gregory F. Kishel, Bankruptcy Judge, United States Bankruptcy Court for the District of Minnesota.

[2] Sallie Mae Servicing Corporation was also a defendant in the adversary proceeding. The parties stipulated that Michele Walker owed Sallie Mae $29,253.75, and owed ECMC $283,354.50, at the time of trial. The Bankruptcy Court determined that all of the student loans were dischargeable, but Sallie Mae did not appeal.

a couple of years as a pharmacy technician and substitute teacher, she entered a master's degree program relating to psychology in 1997. She received her master's degree in school psychology in 2000.

Meanwhile, Michele got married in 1996. Her husband, Troy Walker, is a police officer for the Minneapolis police department and also moonlights as an off-duty security officer. Michele and Troy have five children – the first child born in 1998, one set of twin sons born in May 2000, and a second set of twins born in October 2001.

In 2002, Michele obtained a full-time post-graduate internship as a school psychologist with the Minneapolis Public Schools, earning $16 to $17,000 per year. However, due to the demands of her young family, and budgetary restrictions in the school district, she was unable to continue with that position on a permanent basis after the 2003-2004 school year.

In 2003, both of the twin boys born in 2000 were diagnosed with autism.

In 2004, the Walkers moved from Minneapolis to Hudson, Wisconsin, where they now live. Michele attempted to get a job with the school district in Hudson, and attempted to work as a pharmacy technician in Wisconsin, but for a number of reasons, including caring for the children, the costs of daycare, and Troy's demanding work schedules, she has not worked for a third-party employer since 2004. She did, however, continue to try to further her education even past that point. In 2007, she enrolled in an associate's degree program toward licensure as a registered nurse, but left the program after one semester due to poor attendance attributable to her home life.

By the time of trial in 2008, all five of the children were in school. The two autistic sons, then eight years old, attended school on a mainstreamed basis for most

of the school day. They had also been accepted into the Wisconsin Early Autism Project, a state funded program of intensive therapy for children with autism. These therapy sessions are done at the home, for eight hours a day each on Saturday and Sunday, plus an additional nine to nineteen hours per week on weekday afternoons. One of the parents must be present when the therapy is done. In addition, Michele spends an average of two hours to prepare the boys for the visit. She also must be available during regular school hours to respond to calls from school personnel, in case one of the boys has a "meltdown" at school. She must be able to respond quickly to such episodes in order to avoid as much disruption at the school as possible.

As stated, Michele filed a Chapter 7 petition on April 2, 2004, and she received her discharge on July 12, 2004. Between 2004 and 2007, the Walkers' combined gross income, which came almost exclusively from Troy's employment as a police and security officer, ranged from $59,261 to $67,639. In 2007, which was after Michele received her discharge, but before she filed this adversary proceeding, Troy purchased a $40,000 new Chevrolet Suburban. Previously, the Walkers had incurred a $50,000 home equity loan in the fall of 2005, using $30,000 of the proceeds to build a screened-in deck on their home. Michele filed this adversary proceeding to discharge her student loans on August 15, 2007.

## III. STANDARD OF REVIEW

"Undue hardship 'is a question of law which we review *de novo*. Subsidiary findings of fact on which the legal conclusion is based are reviewed for clear error.'"[3]

---

[3] *Educational Credit Mgmt. Corp. v. Jesperson*, 571 F.3d 775, 779 (8th Cir. 2009) (*quoting In re Reynolds*, 425 F.3d 526, 531 (8th Cir. 2005)).

4

## IV. DISCUSSION

### A. *Subject Matter Jurisdiction / Collateral Attack on the Discharge Order*

Dischargeability of student loans is governed by § 523(a)(8), which provides, in relevant part, that a discharge under § 727 does not discharge an individual debtor from any debt for student loans, "unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents . . . ."[4] In contrast to many other types of debts, § 523(a)(8)'s exclusion of student loans from discharge is "self-executing" in the sense that, "[u]nless the debtor affirmatively secures a hardship determination, the discharge order will not include a student loan debt."[5] In other words, a debtor's obligation on a student loan remains until there has been an express determination that the loan is dischargeable because it imposes an undue hardship on the debtor and the debtor's dependents.

As stated above, Michele did not seek a determination that her student loans were dischargeable until three years after the general discharge order was entered in her bankruptcy case in 2004. ECMC's first point on appeal is that the Bankruptcy Court lacked subject matter jurisdiction to enter the Order discharging the student loans after the discharge order was entered. Relying on the Supreme Court's recent decision in *Travelers Indemnity Company v. Bailey*,[6] ECMC asserts that the 2004 general discharge order is a final judgment, and that Rules 59 and 60 provide the exclusive means for disturbing such a final judgment.[7] Because neither of those rules

---

[4] 11 U.S.C. § 523(a)(8).

[5] *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 450, 124 S.Ct. 1905, 1912, 158 L.Ed.2d 764 (2004).

[6] *Travelers Indem. Co. v. Bailey*, ___ U.S. ____, 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009).

[7] Federal Rules of Civil Procedure 59 and 60 are made applicable in bankruptcy cases pursuant to Federal Rules of Bankruptcy Procedure 9023 and 9024, respectively.

applies here due to time limitations and other reasons, ECMC asserts that the Court lacked subject matter jurisdiction to discharge the student loans.

At the outset, this is not a subject matter jurisdiction issue. Perhaps ECMC couches it as a jurisdictional issue because, it concedes, it did not raise the issue before the Bankruptcy Court,[8] and subject matter jurisdiction can be raised at any time. Indeed, *Travelers Indemnity Company v. Bailey* does not consider jurisdiction, but instead deals with a collateral attack on a prior order. Similarly, here, the issue is whether the adversary proceeding was an attempt to collaterally attack the 2004 discharge order. Although Michele's argument that it is improper to raise this issue for the first time on appeal is thus well-taken, we will nevertheless address the merits of ECMC's argument that the Court lacked the authority to enter the order discharging the student loan debt.

Fundamentally, ECMC's argument confuses the distinction between entry of a general order of discharge pursuant to §§ 727, 1141, 1228, or 1328, and a determination of dischargeability as to the obligation owed to a particular creditor under § 523. The general order of discharge relieves the debtor of obligations, other than those which are nondischargeable because they fit within a category of debt specified by § 523. As to certain categories of debts covered by § 523(c), such as those obtained by actual fraud, the creditor is obligated to itself seek a determination of dischargeability within strict time limits, or the debt is covered by the general discharge. As to others, such as student loans, either the creditor or the debtor may seek a later determination as to whether a statutory exception to dischargeability is applicable.

Contrary to ECMC's assertion, the Bankruptcy Code and Rules provide sources of authority, other than Rules 59 and 60, for the Bankruptcy Court here to

---

[8] Brief for the Appellant at 9, n.4.

have determined the student loan dischargeability action after the discharge order was entered.  Specifically, § 350(b) provides that "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause,"[9] and Rule 5010 provides that "[a] case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b)."[10]  Most notably, however, Rule 4007(b) provides:

> A complaint other than under § 523(c) may be filed at any time.  A case may be reopened without payment of an additional filing fee for the purpose of filing a complaint to obtain a determination under this rule.[11]

In contrast, a complaint to determine the dischargeability of a debt under § 523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors.[12]

ECMC asserts that "at any time" in Rule 4007 means "at any time before discharge is entered."  We disagree.  Had that been the intent of the rule, the rule could have said that.  Moreover, if that had been the rule's meaning, the next sentence in the rule, allowing the reopening of a case to seek a discharge of student loans without payment of fees, would be meaningless.  In sum, we read the rule to mean what it plainly says, namely, that a complaint requesting the determination of dischargeability of student loans under § 523(a)(8) may be filed "at any time" and, if necessary, a closed bankruptcy case may be reopened without payment of an additional filing fee to do so.  In fact, some courts, including the District of Minnesota, permit debtors to

---

[9]  11 U.S.C. § 350(b).

[10]  Fed. R. Bankr. P. 5010.

[11]  Fed. R. Bankr. P. 4007(b).

[12]  Fed. R. Bankr. P. 4007(c).

file such dischargeability complaints without even reopening a closed bankruptcy case.[13]

Hence, Rule 4007 expressly provides on-going authority for bankruptcy courts to adjudicate student loan dischargeability actions after a discharge order is entered, and a debtor need not rely on Rules 59 and 60 to obtain such an adjudication. Rule 4007 reflects the reality of bankruptcy practice. Debtors who file Chapter 7 cases generally seek discharge of other debts apart from student loans. To provide eligible debtors the opportunity to get a fresh start and move on with their lives, the Code and Rules impose quick deadlines for the holding of the debtor's meeting of creditors,[14] and the entry of a general discharge order if no creditor objects within sixty days after the first date scheduled for the meeting of creditors.[15] ECMC's argument, if accepted, would mean that a debtor would be required to either litigate the dischargeability of its student loan to judgment within that sixty day period, or seek a delay of its discharge as to all other debts. While there may be other procedural or substantive impediments to a debtor bringing a student loan dischargeability case after the discharge has been entered (such as ripeness, mootness, or laches, for example), we find no Rule or Code-based time limitation at all as to when a bankruptcy court may adjudicate the dischargeability of student loans.[16]

---

[13] *See* Rule 5010-1(a)(2) of the Local Rules of the United States Bankruptcy Court for the District of Minnesota. Federal Rule of Bankruptcy Procedure 9029 provides authority for courts to make local rules governing the practice and procedure in cases and proceedings in that court.

[14] *See* 11 U.S.C. § 341(a); Fed. R. Bankr. P. 2003(a).

[15] *See* Fed. R. Bankr. P. 4004.

[16] *See* 4 *Collier on Bankruptcy* ¶ 523-04 at 523-19 (16th ed.) ("There are no specific time deadlines imposed by [the] Code or the Federal Rules of Bankruptcy Procedure for the determination of the dischargeability of a debt with respect to section 523(a) discharge exceptions *other than* those arising under subsections 523(a)(2), (4) and (6).") (emphasis in original). In addition, except as to debts under § 523(a)(2), (4), and (6), state courts have concurrent jurisdiction to decide dischargeability, which is most often raised as a defense to a state court lawsuit brought after the discharge has been entered. *See Stabler v. Beyers (In re*

ECMC next asserts that, Rule 4007 notwithstanding, Michele's adversary proceeding to discharge the student loans was an improper collateral attack on the 2004 general discharge order. The 2004 discharge order was a standard one-sentence order of the type entered in most Chapter 7 bankruptcy cases.[17] ECMC asserts that, because Michele did not obtain an express adjudication that her student loans *were* discharged, this standard order was, in effect, an adjudication that the student loans were *not* discharged, and, again, Rule 59 or 60 do not present a basis to have that adjudication set aside.

Without question, *Travelers* confirmed that bankruptcy court orders have finality and cannot be collaterally attacked.[18] And, as stated above, a student loan is not discharged until there is a determination that it is dischargeable under § 523(a)(8). However, contrary to ECMC's assertion, the general discharge order cannot be construed as a determination by the Bankruptcy Court that the student loans did not impose an undue hardship on Michele, or that the loans could not be discharged. We were unable to find a single case so holding.[19]

---

*Stabler*), 418 B.R. 764, 770 (B.A.P. 8th Cir. 2009) ("Aside from determinations of dischargeability under 11 U.S.C. § 523(a)(2), (4), or (6), state courts have concurrent jurisdiction to determine the dischargeability of a debt."). Similarly, there are no time limitations on bringing such defenses in state court.

[17] The discharge order reads, in its entirety: "It appears that the debtor is entitled to a discharge, IT IS ORDERED: The debtor is granted a discharge under section 727 of title 11, United States Code, (the Bankruptcy Code)."

[18] *Travelers Indem. Co. v. Bailey*, 129 S.Ct. at 2205.

[19] ECMC relies on a recent Order from the Bankruptcy Court for the Northern District of California, in which the court dismissed a student loan adversary proceeding which had been filed ten years after the discharge order was entered, "on the grounds that the Court lack[ed] subject matter jurisdiction over such a claim in debtor's 1998 bankruptcy case, without prejudice to such an 'undue hardship' claim being asserted in a subsequent bankruptcy case." *Ehmke v. Sallie Mae, Inc. (In re Ehmke)*, Case No. 98-71834, Adv. No. 09-4364, *Order* at 2 (Bankr. N.D. Cal. February 19, 2010). However, the court in that case did not find that the discharge order had been a final order, did not mention Rules 59, 60, or 4007, and provided no reason for the finding of lack of subject matter jurisdiction. Hence, we do not know what the basis for that

Recently, in *United Student Aid Funds, Inc. v. Espinosa*, the Supreme Court held, in a Chapter 13 case, that a discharge order was not void for purposes of Rule 60(b)(4), and that the debtor's student loans were discharged through the general discharge order, even though the bankruptcy court had not made an express determination of undue hardship.[20] Because it was decided after briefing and oral argument in this case, ECMC did not cite to it. Nevertheless, we mention here that *Espinosa* was a Chapter 13 case in which the discharge order followed the completion of all payments under a confirmed plan which had expressly provided for discharge of the debtor's student loans. In other words, the discharge order in *Espinosa* was "final" on the issue of whether the student loans had been discharged because it could be viewed in conjunction with the order confirming a plan which had provided for the discharge of the student loans.[21] Because this is a Chapter 7 case, and thus the Bankruptcy Court here had not issued a separate order addressing the dischargeability of the student loans (such as a confirmation order), *Espinosa* is distinguishable.

We conclude that the general discharge order in Michele's bankruptcy case was not a "final order" on the issue of dischargeability of the student loans in the sense that *Travelers* contemplates. Thus, Michele's attempt to have her student loans discharged was not an improper collateral attack against that discharge order.

Indeed, not only are debtors permitted to seek a discharge of their student loans after a general discharge has been granted, the Seventh and Second Circuits have both suggested that debtors are permitted to reopen their cases to seek a discharge of their

---

finding was. Further, in the event that that court adopted the arguments made by ECMC here, we simply disagree with that conclusion. Finally, *Ehmke* is distinguishable from this case because, as that court expressly stated, the debtor in that case was eligible to file a new bankruptcy case and seek discharge of her student loans in the new case.

[20] *United Student Aid Funds, Inc. v. Espinosa*, ___ U.S. ____, ___ S.Ct. ____, 2010 WL 1027825 (March 23, 2010).

[21] 2010 WL 1027825 at *7-8.

student loans based on a post-discharge change in circumstances.[22] The District Court for the Eastern District of Michigan has gone even further and held that § 350(b) and Rule 4007(b) not only permit a debtor to reopen a case to seek a new determination of dischargeability based on changed circumstances, but that a debtor who initially *lost* a student loan dischargeability determination may reopen his case and seek a new determination based on changed circumstances, regardless of whether the first determination was made expressly "without prejudice."[23] *Res judicata*, that court essentially held, did not apply if the circumstances had changed.[24] While we need not face that question here, since Michele had not previously sought a determination of dischargeability, we note that such a holding is consistent with § 523(b), which provides that, when a debtor files a second bankruptcy case, and seeks a determination of dischargeability of student loans that were in existence at the time of his first case, the undue hardship issue is determined *de novo* in the new case, notwithstanding a determination of nondischargeability in the prior case.[25]

---

[22] *See In re Roberson*, 999 F.2d 1132, 1138 (7th Cir. 1993) (suggesting that a debtor reopen his case pursuant to Rule 4007 if his situation had not improved following a two-year deferment of his student loans); *In re Brunner*, 831 F.2d 395, 397 (2d Cir. 1987) (suggesting that, because the bankruptcy court's order denying the discharge had been without prejudice, the debtor might reopen the issue of the dischargeability of her student loans pursuant to Rule 4007(a) and (b), based on circumstances existing five years after she had filed her case).

[23] *In re Sobh*, 61 B.R. 576, 579-80 (E.D. Mich. 1986).

[24] *Id. Accord Conner v. Illinois State Scholarship Comm'n (In re Conner)*, 89 B.R. 744, 750 & n. 21 (Bankr. N.D. Ill. 1988) (specifically providing in an order denying dischargeability of a student loan that the debtor could seek another determination of discharge should his situation deteriorate, but the modification request must be in the form of a new complaint based on changed circumstances).

[25] 11 U.S.C. § 523(b); *In re Lewis*, 276 B.R. 912, 920 and n.5 (Bankr. C.D. Ill. 2002) ("The presumptive nondischargeability of student loans was never meant to be a permanent millstone around the debtor's neck.").

B. *Changed Circumstances and Reconsideration Under Rules 59 and 60*

That said, as ECMC points out, we have held that Rules 59 and 60 do indeed apply in student loan cases where the bankruptcy court has made an actual determination of undue hardship and one of the parties seeks reconsideration of such a determination.[26] Further, we held in *In re Woodcock* that, in such a situation, a judgment of nondischargeability of a student loan is a final judgment and is not subject to collateral attack based on an argument that the debtor's circumstances have not improved.[27]

We view our decision in *Woodcock* to be consistent with *Roberson*, *Brunner*, and *Sobh* because it arose from a distinguishable context. We emphasize here the distinction between seeking a determination regarding dischargeability based on changed circumstances, and seeking *reconsideration* of a prior determination of dischargeability. The debtor in *Woodcock* was proceeding under a Rule 60(b) motion for relief from an order finding that there was no undue hardship and, as we very pointedly stated in that case, was essentially arguing that the bankruptcy court had *gotten it wrong* the first time.[28] In other words, instead of arguing that his

---

[26] *See, e.g., Woodcock v. U.S. Dept. of Education (In re Woodcock)*, 326 B.R. 441 (B.A.P. 8th Cir. 2005) (denying the debtor's Rule 60 motion to reconsider the court's determination that he had an ability to earn a living). As ECMC points out, people often collectively refer to Rule 59 and 60 motions as motions to reconsider when, in fact, the rules serve different purposes and produce different consequences. For these purposes, however, the distinction is not important.

[27] *In re Woodcock*, 326 B.R. at 447.

[28] We said, at page 446:

While cast in the rubric of Rule 60, at bottom, all of Woodcock's arguments boil down to claims that the Colorado bankruptcy court got it wrong. It was wrong because it misunderstood the facts, or it was wrong because it misapplied the law, or it was wrong because it did not have all of the facts, or, most fundamentally, its decision that excepting Woodcock's student loans from his discharge would not constitute an undue hardship turns out, in hindsight, to have been wrong. . . .

circumstances had changed such that he was now able to demonstrate undue hardship, he was arguing that the passage of time proved that he had been right all along that he would not find a suitable job. We concluded that the determination of nondischargeability was not subject to collateral attack based on an argument that the debtor's circumstances had *not improved*, as opposed to an argument that the circumstances *had changed.* Thus, while Rules 59 and 60 apply when a party asks the court to *reconsider* a determination of dischargeability as was the case in *Woodcock*, they do not apply when there has either been no express determination of dischargeability or when the circumstances have changed since a prior determination of nondischargeability.

ECMC asserts that this conclusion results in piecemeal litigation of dischargeability. However, as discussed above, the Bankruptcy Code and Rules give student loans special treatment, including treating undue hardship as a fluid concept. Allowing debtors an opportunity to attempt to make student loan payments post-discharge after other debts are wiped away, without fear of losing the ability to bring a dischargeability action until the debtor is eligible to file a new bankruptcy case, is a desired result. ECMC also points out that a student loan creditor might be harmed if, for example, it incurs post-discharge collection costs only to be subject to a subsequent dischargeability action, but such harm could be a basis for a laches or other defense in the later dischargeability action. Indeed, ECMC raised a laches argument before the Bankruptcy Court in this case, but it does not argue in this appeal that the Bankruptcy Court erred in rejecting that defense.[29]

These mistakes all were, could have been, and certainly should have been the subject of appeals. They are not proper grounds for a collateral attack at this late juncture.

[29] Although ECMC does not argue on appeal that the Court erred in rejecting its laches argument, we note that Michele's waiting three years to bring the dischargeability action, in and of itself, does not support a laches defense. Laches is an equitable defense based on "all the particular circumstances of each case. . . including the length of delay, the reasons for it, its effect on the defendant, and the overall fairness of permitting the plaintiff to assert his or her

13

In sum, Rule 4007 permitted Michele to bring her nondischargeability action when she did, and doing so was not a collateral attack on her general discharge order. ECMC raised a laches argument before the Bankruptcy Court, but it does not argue on appeal that the Court's rejection of that argument was error. As a result, the Bankruptcy Court did not err in hearing the case.

## C. *The Finding of Undue Hardship*

### 1. The Relevant Time of Determination

ECMC next argues that the evidence did not support a finding of undue hardship. On that point, ECMC first asserts that the Bankruptcy Court erred in looking at Michele's circumstances both at the time of the discharge in 2004, and at the time of trial in 2008. ECMC asserts that the only relevant time period was the time of the discharge in 2004, and that the Court should have limited its analysis to the circumstances as they existed at that time. This follows from ECMC's prior contention that the student loan determination needed to be made prior to entry of the 2004 discharge order. At the same time, ECMC argues that the Bankruptcy Court should have given more weight to the Walkers' post-discharge loans for an SUV and deck addition. In any event, since we have concluded that a debtor can bring a student loan case after discharge, and based on changed circumstances, it necessarily follows that the court may, and should, consider those circumstances existing at the time of trial.

In arguing that the relevant time was the time of discharge in 2004, ECMC focuses on the language in *Bender v. ECMC*, which was a Chapter 13 case, in which

---

action." *Citizens and Landowners Against the Miles City/New Underwood Powerline v. Secretary, U.S. Dept. of Energy*, 683 F.2d 1171, 1174 (8th Cir. 1982). In order to prevail on a laches argument, ECMC had the burden to demonstrate such circumstances beyond the mere lapse of time, and it did not do so.

14

the Court of Appeals for the Eighth Circuit said that the factual question in a student loan case is "whether there is an undue hardship at the time of discharge, not whether there is an undue hardship at the time a § 523(a)(8) proceeding is commenced."[30]  In addition, relying on *Bender*, we said in *Woodcock*, a Chapter 7 case, that "the determination of dischargeability is best made at the time of discharge."[31]  This language has been construed as ECMC urges here – namely, that the relevant determination is at the time of discharge, not the time of trial, in all cases.[32]

However, squarely faced with ECMC's basic premise here – that a debtor must bring a dischargeability action before the general discharge order is entered and, thus, the only relevant time is the time of discharge – it is important to examine the contexts in which *Bender* and *Woodcock* were decided.  *Bender* was a Chapter 13 case, and the issue there was *ripeness.*  The debtor in that case sought a determination of dischargeability of her student loans early in her Chapter 13 case, and the Eighth Circuit essentially said that the issue was premature.  Although some courts have disagreed with the conclusion reached in *Bender* on the issue of ripeness, and have allowed debtors to seek discharge of student loans early in Chapter 13 cases,[33] the conclusion in *Bender* that these determinations should occur relatively close to the anticipated discharge date makes sense in the Chapter 13 context, where a general order of discharge is not entered until the debtor has made the payments required

---

[30] *In re Bender*, 368 F.3d 846, 848 (8th Cir. 2004).

[31] *In re Woodcock*, 326 B.R. 441, 447 (B.A.P. 8th Cir. 2005) ("The determination of dischargeability is best made at the time of discharge"; declining to revisit the hardship issue in a Rule 60(b) motion) (*citing In re Bender*, 368 F.3d at 848).

[32] *See, e.g., In re Mabry*, 398 B.R. 339, 344 (Bankr. E.D. Mo. 2008) (relying on *Woodcock* for the proposition that the court should examine the circumstances at the time of discharge, and not at the time of trial, in a Chapter 7 student loan case).

[33] *See In re Cassim*, 594 F.3d 432 (6th Cir. 2010);  *In re Coleman*, 560 F.3d 1000 (9th Cir. 2009); *Ekenasi v. The Education Resources Institute (In re Ekenasi)*, 325 F.3d 541 (4th Cir. 2003).

15

under its plan, for which debtors may be given up to five years to do so.[34] Since many Chapter 13 cases fail before obtaining a general discharge, an earlier undue hardship determination could be a waste of time. In addition, as the Eighth Circuit noted, a Chapter 13 debtor remains protected by the automatic stay while the case is pending, so the student loan creditor may not seek to enforce its debt in another court. However, those rationales do not apply in a Chapter 7 case such as this one. Once a general discharge order is entered, a student loan creditor whose debt has not yet been discharged is no longer barred by the automatic stay from taking enforcement action.

*Woodcock* was a Chapter 7 case, but, as discussed above, it involved a Rule 60 motion in which the debtor sought reconsideration of determination that had, in fact, been made at the time of the discharge. Hence, for purposes of reconsidering that determination on the allegation that it had been wrongly decided, it would have been improper to look at events occurring subsequent to the decision. In other words, the reviewing court could not use the benefit of hindsight to analyze the bankruptcy court's decision made at the time of discharge. Thus, the focus in *Woodcock* was properly determined to be at the time the action was brought which, in that particular case, happened to be around the time of discharge.

When considering the contexts in which *Bender* and *Woodcock* were decided, we do not view it to be the law in this circuit that, when a Chapter 7 debtor seeks to discharge a student loan after the discharge has been entered, the bankruptcy court is limited to the circumstances existing at the time of discharge. As one court has observed, most cases do not even discuss what the appropriate date is in making the determination of whether a student loan is dischargeable, and instead simply assume that the circumstances at the time of trial will be used as the basis for deciding whether repayment of the loan will be an undue hardship.[35] In fact, we did so in the case of *In*

---

[34]  11 U.S.C. § 1325(b).

[35]  *In re Lien*, 224 B.R. 431, 434 (Bankr. D. Alaska 1998).

*re Andresen*,[36] and the Eighth Circuit recently did so in *Educational Credit Management Corporation v. Jesperson*.[37]

Finally, analyzing the circumstances existing at the time of trial makes practical sense. As discussed more fully below, the test for determining undue hardship requires courts to consider, among other things, "reasonably reliable future financial resources." In other words, regardless of when the analysis occurs, bankruptcy courts are required to predict future circumstances. Even if there are no changed circumstances, it makes no sense to require a court conducting a trial in 2008, for example, to go back to 2004 and make projections based on the 2004 facts, when it has the actual facts as they exist in 2008.

Based on the foregoing, the Bankruptcy Court did not err when it considered Michele's circumstances as they existed at the time of trial.

2. The Evidence of the Circumstances at the Time of Trial

The Eighth Circuit has adopted a totality-of-the-circumstances test in evaluating undue hardship in student loan cases:

> We apply a totality-of-the-circumstances test in determining undue hardship under § 523(a)(8). Reviewing courts must consider the debtor's

---

[36] 232 B.R. 127 (B.A.P. 8th Cir. 1999), *abrogated on other grounds, In re Long*, 322 F.3d 549 (8th Cir. 2003). In that case, the debtor had obtained a discharge in 1991, sustained a back injury in 1993, and filed an adversary proceeding to discharge her student loan in 1996. We reviewed the bankruptcy court's decision, which had been based on the circumstances existing at the time of trial in 1998, including the finding that the disability caused by the debtor's post-discharge back injury restricted her earning capacity, and affirmed the bankruptcy court's finding that the student loans constituted an undue hardship on the debtor.

[37] 571 F.3d 775 (8th Cir. 2009) (discharge order entered on March 23, 2006, but the Court of Appeals reviewed, without comment, the circumstances existing at time of trial held in February 2007).

past, present, and reasonably reliable future financial resources, the debtor's reasonable and necessary living expenses, and "any other relevant facts and circumstances." The debtor has the burden of proving undue hardship by a preponderance of the evidence. The burden is rigorous. "Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt-while still allowing for a minimal standard of living-then the debt should not be discharged."[38]

### a. *Gross Income*

The parties stipulated that the Walkers' gross household income in 2007 was $67,939.[39] This income came solely from Troy's employment.[40] The Bankruptcy Court concluded that, due to the family situation, Michele is not reasonably able to work outside the home at this point. Although no expert testified about how long this situation would last, the Court found it unlikely that Michele will be able to work at least until the older twins reach the age of majority, and perhaps even past that point, given the uncertainty about their future, Michele's continual absence from the

---

[38] *Educational Credit Management Corp. v. Jesperson*, 571 F.3d 775, 779 (8th Cir. 2009) (*citing In re Long*, 322 F.3d 549, 554-55 (8th Cir. 2003)) (footnote omitted).

[39] *Second Amended Stipulation of Uncontroverted Facts* (Doc. # 27) at ¶ 6.

[40] The Bankruptcy Court was correct in considering his income in its analysis. *See Sweeney v. Educ. Credit Mgmt. Corp. (In re Sweeney)*, 304 B.R. 360, 362-63 (D. Neb. 2002) ("Overwhelming authority requires that a court consider the spouse's income. This Court finds no published opinion of a court that holds to the contrary."); *Collins v. Educ. Credit Mgmt. Corp. (In re Collins)*, 376 B.R. 708, 714 (Bankr. D. Minn. 2007) ("A court must consider a spouse's income in deciding whether a student loan constitutes an undue burden . . . . For reasons of sound authority and sound public policy, the court must view undue hardship in light of the total income of the family.") (citation omitted); *Shadwick, v. U.S. Dept. of Education (In re Shadwick)*, 341 B.R. 6, 11 (Bankr. W.D. Mo. 2006) ("In addition to the current and prospective income of the Debtor, the Court must consider the income or earning potential of the Debtor's spouse.") (citations omitted). *But see Reynolds v. Penn. Higher Educ. Assistance Agency (In re Reynolds)*, 425 F.3d 526, 535 (8th Cir. 2005) (Bright, J., concurring) (stating that, since the student loans were incurred prior to the marriage, and each spouse contributed equally to the household, that should be taken into account).

workforce, and the increasing staleness of her education. The evidence supported those factual conclusions, and the Court did not clearly err in so finding.

Despite the stipulation that annual gross income in 2007 was $67,939, the Bankruptcy Court calculated the Walkers' gross income at $5,700 per month (or $68,400 per year), based on their 2007 tax return and W-2s from Troy's police job. Suggesting that the Bankruptcy Court engaged in some speculation in arriving at this figure, particularly as to the extra income from Troy's second job, ECMC suggests that the record does not support this finding. However, in view of the fact that the parties stipulated to the gross income amount, it was unnecessary for the Court to make the separate calculations as to that figure. Based on the stipulated gross annual amount of $67,939, the Walkers' monthly gross income was $5,661.58.[41]

b. *Net Income*

Then, using the Walkers' actual federal and state tax liability for 2007 (as opposed to withholdings from Troy's paychecks), the Court averaged the taxes over twelve months, and arrived at a monthly tax obligation of $372. We find no error in calculating the Walkers' tax obligations in this manner. Indeed, when the evidence suggests that the debtor is under- or over-withholding, as was the case here,[42] it is a particularly appropriate method for making a determination as to tax liability.

As to other withholdings from income, the Bankruptcy Court found that Troy's paystubs from his police job showed that he had $934.10 per month in other regular

---

[41] The Court's alleged speculation actually worked in ECMC's favor because the Court's calculation resulted in a higher monthly gross income than that stipulated to ECMC.

[42] The parties stipulated that the Walkers received a federal income tax refund for the tax year 2007 in the amount of $10,460, but owed the State of Wisconsin $2,643 that year, for a net income tax refund of $7,817. *Second Amended Stipulation of Uncontroverted Facts* (Doc. #27) at ¶ 28.

payroll deductions for items such as retirement, deferred compensation, medical insurance, life insurance, and pension. ECMC did not assert that any of these deductions were inaccurate or improper at the time of trial. ECMC points out that Michele did not introduce paystubs from Troy's moonlighting job and asserts that the Court was thus required to "speculate" that there were no payroll deductions from that job. Similarly, there had been no evidence that FICA was deducted from any of his paychecks, and so the Court again "speculated" that there were none. Those conclusions were not speculation, however. Rather, Michele had the burden of proving deductions from income and offered no proof of deductions, other than those shown on the police paychecks. The Bankruptcy Court, therefore, correctly concluded that there were no other deductions, a conclusion that actually works in ECMC's favor. Thus, when added to the averaged (actual) tax obligations, the Bankruptcy Court held that the withholdings from Troy's paychecks totaled $1,306.10 per month. This was not clearly erroneous. Deducting that from gross income of $5,661.58, Troy had $4,355.48 in net monthly income for 2007.[43]

c. *The Amount of Expenses*

The Bankruptcy Court arrived at a monthly expense amount, as of the time of trial, in the amount of $5,913, based on a household budget supplied by Michele. With one exception for an expense for "special services copays" which no longer existed by the time of trial (and was therefore removed from the calculation), the Court acknowledged that Michele did not testify about each of the expenses in detail, nor did it review each line item in detail. The Court pointed out, however, that, other than the reasonableness of expenses relating to the SUV and deck addition, ECMC took no exception to the amounts of, or the reasonableness of, any of the expenses, and ECMC does not assert on appeal that the Court erred in determining that the

---

[43] Again, this is less than the $4,394 net income found by the Court.

expenses, but for the SUV and deck addition, are reasonable. As a result, the Court did not clearly err in calculating the amount of the expenses at $5,913.

### d. *The Reasonableness of the SUV and Deck and the Walkers' Ability to Pay an ICRP*

ECMC asserts that the Bankruptcy Court erred in finding that two of the listed expenses were reasonable and necessary for Michele's support. Specifically, in the fall of 2005, which was after Michele had received her discharge, Troy took out a $48,000 second mortgage and used a portion of the proceeds to build a $30,000 screened-in deck on their house.[44] The monthly payment on the second mortgage is $373.52. And, in 2007, Troy purchased a new $40,000 "fully loaded" Chevrolet Suburban, when Troy already owned three cars.[45] The monthly payment on the SUV is $850.

In the Eighth Circuit, in order to be reasonable and necessary under § 523(a)(8), an expense must be "modest and commensurate with the debtor's resources."[46] The Eighth Circuit also said that, if a debtor can make student loan payments while still maintaining a minimal standard of living, the absence of a fresh start is not undue hardship.[47] Further, "[a] debtor is not entitled to an undue hardship discharge of student loan debts when his current income is the result of self-imposed limitations,

---

[44] *See Second Amended Stipulation of Uncontroverted Facts* (Doc. #27) at ¶ 30.

[45] *See Second Amended Stipulation of Uncontroverted Facts* (Doc. #27) at ¶ 29. At the time, Troy owned a 1998 Saturn which they loaned to the Debtor's mother, a 1998 Ford Windstar van, and a 2004 Kia Sedona. One of the vehicles was in the shop for repairs.

[46] *In re Jesperson*, 571 F.3d at 780.

[47] *Id.* at 782.

rather than lack of job skills, and he has not made payments on his student loan debt despite the ability to do so."[48]

In addition, the Eighth Circuit Court of Appeals confirmed in *Jesperson* that the Income Contingent Repayment Program for student loans, which is available to Michele, is a factor to be considered in evaluating the totality of the debtor's circumstances:

> [U]ndue hardship under § 523(a)(8) continues to require separate analysis under which, in this circuit, the ICRP is "a factor" to consider in evaluating the totality of the debtor's circumstances. However, a student loan should not be discharged when the debtor has "the ability to earn sufficient income to make student loan payments under the various special opportunities made available through the Student Loan Program."[49]

Although some question remains as to the weight to be given to the ability to make an ICRP payment following *Jesperson*,[50] the Eighth Circuit made clear that the ability to do so is, at a minimum, an important factor in the analysis.

ECMC first asserts that a luxury vehicle and large deck with combined payments of over $1,200 per month is not modest and commensurate in light of the

---

[48] *Id.*

[49] *Id.* at 781 (citations omitted).

[50] *See id.* at 784 (Smith, J., concurring) (stating that, while the ICRP is a factor relating to good faith in the analysis, a bankruptcy court should not place too much weight on the debtor's refusal to enroll in the ICRP) *Id.* at 786 (Bye, J., dissenting) (stating that a debtor is not ineligible for a hardship discharge if capable of making payments under the ICRP).

Walkers' resources. In addition, ECMC correctly points out that the payment on the SUV alone is greater than what Michele's payment would be under the ICRP.[51]

The Bankruptcy Court conceded that, viewed in isolation, the SUV and deck expenditures might not be reasonable under the totality of the circumstances approach. Nevertheless, in a detailed discussion of the Walkers' family and marital situation, the Court concluded that these expenses were reasonable and necessary under the particular circumstances of the case. We need not decide here whether the Bankruptcy Court erred in those findings, nor is it necessary for us to discuss the weight to be given the ability to make the ICRP following *Jesperson*, because the Walkers' income is insufficient to make the ICRP payment, or any payment on the student loans, even if they were not incurring the SUV and second mortgage expenses.

As stated above, the uncontroverted evidence was that the Walkers' monthly expenses, which included the SUV and second mortgage payment, totaled $5,913. If the SUV and second mortgage payments are removed, their expenses total $4,689.48 per month. Their monthly net income is $4,355.48. Thus, the Walkers operate at a deficit of $334 per month, even without considering those expenses. ECMC's counsel suggested at the hearing that there was no evidence that the Walkers were not making the SUV and second mortgage payments and, thus, they must be coming up with the money somewhere to make them. If they can come up with the money to make those payments, ECMC argues, they should be required to come up with the money to make the ICRP. However, there was no evidence to rebut the actual numbers relating to the Walkers' income and expenses, and the numbers show that the Walkers are unable to make the ICRP payments notwithstanding the SUV and second mortgage payments.

As a result, while we acknowledge, as the Bankruptcy Court did, that attempting to discharge a large amount of student loans, while enjoying a new SUV

---

[51] The parties stipulated that the ICRP payment would be $593.98 per month. *Second Amended Stipulation of Uncontroverted Facts* (Doc. # 27) at ¶ 24.

and deck addition may seem troublesome to the casual observer, the reality of the Walkers' budget is that Michele cannot afford to make any payments on her student loans and still maintain a minimal standard of living for herself and her family. That circumstance, based on the evidence offered, is highly likely to continue for many years, regardless of whether the Walkers are able to keep the house and SUV, or not. Therefore, the Bankruptcy Court did not err in finding the student loans to be dischargeable under § 523(a)(8) as an undue hardship on Michele and her dependents.

## V. CONCLUSION

For the foregoing reasons, the Bankruptcy Court had the authority to determine the dischargeability of Michele D. Walker's student loans. Further, the Bankruptcy Court did not err in finding that requiring Michele to repay her student loans would impose an undue hardship on her and her dependents and, therefore, that such debts are dischargeable pursuant to 11 U.S.C. § 523(a)(8). The judgment is, therefore, AFFIRMED.

---