LOKEN, Chief Judge.
Mark Allen Jesperson, a recently licensed Minnesota attorney, petitioned for Chapter 7 bankruptcy relief in October 2005 and commenced this core proceeding against his student loan creditors, seeking an undue hardship discharge of substantial student loan debts, which would otherwise be non-dischargeable under 11 U.S.C. § 523(a)(8). The bankruptcy court concluded that Jesperson’s student loan debts “constitute an undue hardship ... and are accordingly discharged.” In re Jesperson, 366 B.R. 908, 919 (Bankr.D.Minn.2007). The district court affirmed. Creditor Educational Credit Management Corporation (ECMC) appeals this final judgment. The issue, as we perceive it, is whether a recent law school graduate who is reasonably likely to be able to make significant debt repayments in the foreseeable future, and who qualifies for the Department of Education’s twenty-five year Income Contingent Repayment Plan, is entitled to an undue hardship discharge because, as the bankruptcy court put it, it is unlikely that his “shockingly immense” student loan debts will be totally repaid and therefore, “without the relief of discharge now, the debtor would, in effect, be sentenced to 25 years in a debtors’ prison without walls.” 366 B.R. at 916, 918. Reviewing the determination of undue hardship de novo, we reverse. See In re Long, 322 F.3d 549, 553 (8th Cir.2003) (standard of review).
I.
Section 523(a)(8) of the Bankruptcy Code provides that debts for educational loans “made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit,” may not be discharged unless “excepting such debt from discharge ... would impose an undue hardship on the debtor and the debtor’s dependents.” Federal government student loan programs began in 1958. In 1973, to curb perceived abuses, the Commission on the Bankruptcy Laws of the United States recommended that “educational loans be nondischargeable unless the first payment falls due more than five years prior to the petition.” H.R. Doc. No. 93-137 (1973), reprinted in B App. Collier on Bankruptcy, pt. 4(c), at 4-132 (15th rev. ed.2008). Congress enacted this recommendation in the Bankruptcy Reform Act of 1978. Pub.L. No. 95-598, § 523(a)(8), 92 Stat. 2549, 2591 (1978), codified at 11 U.S.C. § 523(a)(8). In 1990, Congress lengthened from five to seven years the period beyond which government-assisted student loans became automatically dischargeable. Pub.L. No. 101-647, § 3621, 104 Stat. 4789, 4964-65 (1990), amending 11 U.S.C. § 523(a)(8)(A). Then, in the Higher Education Amendments of 1998, Congress eliminated this time limitation, making “undue hardship” the only exception to non-dischargeability. Pub.L. No. 105-244, § 971(a), 112 Stat. 1581, 1837 (1998).
*779 We apply a totality-of-the-circumstances test in determining undue hardship under § 523(a)(8).[1] Reviewing courts must consider the debtor’s past, present, and reasonably reliable future financial resources, the debtor’s reasonable and necessary living expenses, and “any other relevant facts and circumstances.” Long, 322 F.3d at 554. The debtor has the burden of proving undue hardship by a preponderance of the evidence. The burden is rigorous. “Simply put, if the debt- or’s reasonable future financial resources will sufficiently cover payment of the student loan debt — while still allowing for a minimal standard of living — then the debt should not be discharged.” Id. at 554-55. Undue hardship “is a question of law, which we review de novo. Subsidiary findings of fact on which the legal conclusion is based are reviewed for clear error.” In re Reynolds, 425 F.3d 526, 531 (8th Cir.2005).
II.
When this case was tried in February 2007, Jesperson was forty-three years old, in good health, and unmarried, with two sons from different relationships living with their mothers. He began college in 1983, attended three schools over the next eleven years, and graduated from the University of Minnesota-Duluth in 1994. He began law school in 1996, changed schools in 1997, completed his legal education in 2000, and passed the bar on his first attempt in February 2002. At the time of trial, he owed ECMC $304,463.62 in principal, interest, and collection costs on eighteen student loans, and he owed Arrow Financial Services $58,755.26 on seven other student loans. He has never repaid any part of any loan.
The bankruptcy court found that Jesper-son’s “record of work experience is besmirched by a patent lack of ambition, cooperation and commitment.” 366 B.R. at 911. After passing the bar, Jesperson was hired as a judicial clerk on the island of Saipan, then as an attorney with Alaska Legal Services, and then as a legal temporary with Kelly Services, Inc. He quit each job for a variety of personal reasons. Several months after leaving Kelly, he began work for another placement agency, Spherion Professional Services. At the time of trial, he was working on a project that paid $25 an hour. He was one of only ten lawyers Spherion retained out of a pool of sixty. He testified at trial:
Q It’s true, Mr. Jesperson, that you think this debt should just go away, isn’t that true:
A Yes.
Q And even if you had, Mr. Jesperson, an extra $500 per month, you don’t think you should have to put that towards your student loans, do you?
A No.
Based on gross monthly income of $4,000, Jesperson stipulated that he was likely in the 33% combined federal and state income tax bracket. Using this inflated tax rate, the bankruptcy court found that his current after-tax income was *780 $2680 per month. Use of the inflated tax rate was clear error. Arguably, Jesper-son’s failure to make a good faith estimate of his applicable tax rate means that he failed to prove undue hardship. Alternatively, a reasonable estimate of the combined rate for gross income of $48,000 would be 17.5%, producing after-tax net income of $3300 per month rather than $2680 per month. The bankruptcy court estimated Jesperson’s “basic necessary monthly expenses” as $2857 — $1000 for housing, $1000 for child support, $325 for food, $142 for auto maintenance and insurance, $250 for gasoline, and $140 for parking. 366 B.R. at 912. However, Jesperson testified at trial that he lived rent free with his brother, expected to pay his brother $500 per month, and was looking for an apartment. Estimating his basic necessary monthly housing expense at $1000 per month, rather than $500, was clear error. A debtor making a good faith effort to repay loans would continue to live with his brother to save money. While Jesperson is under a court order to pay $500 per month to support his elder son, he testified he has never made a full monthly payment. He does not owe child support for the younger son, but occasionally pays $200-$400 to the mother of this son, and feels an obligation to pay $500 to support each child.
Based on these estimates, the bankruptcy court concluded that “Jesper-son’s current surplus is at best a trifle and more likely a fiction.” 366 B.R. at 918-19. This was clear error. A court may not engage in speculation when determining net income and reasonable and necessary living expenses. See, e.g., In re Rose, 324 B.R. 709, 712 (8th Cir. BAP 2005). To be reasonable and necessary, an expense must be “modest and commensurate with the debtor’s resources.” In re DeBrower, 387 B.R. 587, 590 (Bankr.N.D.Iowa 2008). On this record, it is apparent that the court underestimated Jesperson’s monthly net income and overestimated his reasonable and necessary living expenses in concluding he has no current surplus from which student loans could be repaid. Compare In re Ekenasi, 325 F.3d 541, 548 (4th Cir.2003). A reasonable estimate would be a surplus of approximately $900 per month.
III.
Jesperson’s young age, good health, number of degrees, marketable skills, and lack of substantial obligations to dependents or mental or physical impairments weigh in favor of not granting an undue hardship discharge. See, e.g., Oyler v. Educ. Credit Mgmt. Corp., 397 F.3d 382, 386 (6th Cir.2005); In re Gerhardt, 348 F.3d 89, 92-93 (5th Cir.2003); Goulet v. Educ. Credit Mgmt. Corp., 284 F.3d 773, 779 (7th Cir.2002); In re Burton, 117 B.R. 167, 170 (Bankr.W.D.Pa.1990). Thus, on this record, the only reason he has even a colorable claim of undue hardship is the sheer magnitude of his student loan debts. While the size of student loan debts relative to the debtor’s financial condition is relevant, this should rarely be a determining factor:
it would be perverse to allow the debtor to benefit from [his] own inaction, delay and recalcitrance by automatically granting discharge simply because the debt is a sizeable one. This, of course, would benefit those who delay and obstruct the longest and could encourage other students to follow the [same] course.
United States v. Kephart, 170 B.R. 787, 792 (W.D.N.Y.1994).
When the size of the debts is the principal basis for a claim of undue hardship, the generous repayment plans Congress authorized the Secretary of Edu *781 cation to design and offer under the William D. Ford Federal Direct Student Loan Program become more relevant to a totality-of-the-circumstances undue hardship analysis. See Student Loan Reform Act of 1993, Pub.L. No. 103-66, tit. IV, § 4021, 107 Stat. 312, 341, codified at 20 U.S.C. § 1087e(d); 34 C.F.R. § 685.208. The most generous plan is the Income Contingent Repayment Plan (“ICRP”), which permits an eligible borrower to make “varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years.” § 1087e(d)(l)(D); see 34 C.F.R. § 685.209. Though the House and Senate bills initially provided that loans issued under the Direct Student Loan Program would not be dischargeable, the House Conference Report explained why this provision was deleted from the final bill:
The conferees believe that current provisions of the Bankruptcy Code are sufficient to protect against unnecessary discharge of direct student loans in bankruptcy. Section 523(a)(8) of the Bankruptcy Code operates to prevent the discharge of federally guaranteed education loans except in cases ... where failure to allow the discharge would impose an undue hardship.... It is the intent of the conferees that loans made pursuant to the Federal Direct Student Loan Program would be subject to these same limitations on discharge.
H.R. Conf. Rep. No. 103-213, at 448-49 (1993), reprinted in 1993 U.S.C.C.A.N. 1088, 1137-38. Thus, undue hardship under § 523(a)(8) continues to require separate analysis under which, in this circuit, the ICRP is “a factor” to consider in evaluating the totality of the debtor’s circumstances. In re Lee, 352 B.R. 91, 95 (8th Cir. BAP 2006). However, a student loan should not be discharged when the debtor has “the ability to earn sufficient income to make student loan payments under the various special opportunities made available through the Student Loan Program.” In re VerMaas, 302 B.R. 650, 660 (Bankr. D.Neb.2003).
Under the ICRP, an eligible debtor’s annual loan payment is equal to twenty percent of the difference between his adjusted gross income and the poverty level for his family size, regardless of the amount of unpaid student loan debt. 34 C.F.R. § 685.209(a)(2)-(3). Repayments are made monthly. § 685.208(k). The Secretary recalculates the annual payment amount each year based on changes in the borrower’s adjusted gross income and the HHS Poverty Guidelines and may adjust the obligation based upon special circumstances such as a loss of employment. §§ 685.209(a)(5), (c)(3). If the borrower has not repaid the loan at the end of twenty five years, “the Secretary cancels the unpaid portion of the loan.” § 685.209(c)(4)(iv). The Secretary may require a borrower who has defaulted to repay the student loan pursuant to an ICRP, 20 U.S.C. § 1087e(d)(5)(B), confirming that the ICRP is an appropriate way for borrowers to avoid undue hardship while repaying their loans.[2]
ECMC presented undisputed evidence that its loans to Jesperson are eligible for the ICRP. Based on Jesperson’s adjusted gross income at the time of trial, the bankruptcy court found that his 2008 monthly ICRP payments would be $629 per month for a family of one, $572 per *782 month for a family of two, and $514 per month for a family of three, without regard to the size of his unpaid student loan balance. Thus, with a current surplus of $900 per month, the record establishes that he can make ICRP payments on his ECMC loans without compromising a minimal standard of living. In these circumstances, “the debt should not be discharged.” Long, 322 F.3d at 554-55; see In re Faish, 72 F.3d 298, 306 (3d Cir.1995).
The bankruptcy court and the district court rejected reliance on the ICRP because “it does not offer a fresh start” and “might even be viewed as inimical to the goals of the fresh start because the ICRP allows for negative amortization of the student loan debt and a potentially significant tax bill if the student loan is ultimately forgiven after 25 years.” 366 B.R. at 915, quoting Lee, 352 B.R. at 97. We disagree. In § 523(a)(8), Congress carved an exception to the “fresh start” permitted by discharge for unpaid, federally subsidized student loans. If the debtor with the help of an ICRP program can make student loan repayments while still maintaining a minimal standard of living, the absence of a fresh start is not undue hardship.
The bankruptcy court and the district court also relied on a flawed analysis of the ICRP. To demonstrate “negative amortization,” the bankruptcy court presented a chart showing Jesperson’s student loan debt to ECMC growing to $1,746,256 over the twenty-five-year ICRP repayment period on account of the capitalization of unpaid interest if he made $514 monthly ICRP payments. But the chart ignored the ICRP’s explicit ten percent limit on the capitalization of unpaid interest. 34 C.F.R. § 685.209(c)(5). Likewise, the court’s reference to “a potentially significant tax bill” when any unpaid balance is cancelled after twenty-five years ignored the fact that cancellation results in taxable income only if the borrower has assets exceeding the amount of debt being can-celled. See 26 U.S.C. § 108(a)(1)(B).
Jesperson is a paradigmatic example of a student loan debtor for whom ICRP eligibility combined with his other circumstances require a conclusion of no undue hardship. Near the start of his legal career, he seeks bankruptcy discharge of multiple student loan debts he never tried to repay. Recent employment is evidence that, if motivated, he will enjoy sustained legal employment in future years, profiting from his many years of loan-subsidized higher education. Based on Jesperson’s “history of employment retention difficulty,” the bankruptcy court thought it unlikely he would increase or even maintain his current rate of pay in the future. But this pessimistic speculation is unwarranted and inappropriate. A debtor is not entitled to an undue hardship discharge of student loan debts when his current income is the result of self-imposed limitations, rather than lack of job skills, and he has not made payments on his student loan debt despite the ability to do so. In re Loftus, 371 B.R. 402, 410-11 (Bankr.N.D.Iowa 2007). “With the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses.” In re Roberson, 999 F.2d 1132, 1136 (7th Cir.1993). Here, Jesper-son testified that he was unaware of the ICRP until “settlement negotiations” in this proceeding, further evidence of a less than good faith effort to repay his student loan debts.
On this record, we conclude that, with the aid of an income contingent repayment plan, Mark Allen Jesperson can presently make student loan payments without compromising a minimal standard of living, *783 and he has the potential of repaying at least a substantial portion of his student loan debts during the ICRP repayment period. When a debtor is eligible for the ICRP, the court in determining undue hardship should be less concerned that future income may decline. The ICRP formula adjusts for such declines, without regard to the unpaid student loan balance, which in most cases will avoid undue hardship. Therefore, however unattractive or unfair Jesperson may find this situation, he is not entitled to an undue hardship discharge under § 523(a)(8). The judgment of the district court is reversed, and the case is remanded with directions to enter an order declaring that Jesperson’s student loan debts to ECMC are not discharged.

. Most circuits apply a three-part undue hardship test adopted in Brunner v. N.Y. State Higher Educ. Servs. Corp., 831 F.2d 395, 396 (2d Cir. 1987), under which the debtor must show (i) based on current income and expenses, he cannot maintain a minimal standard of living if required to repay student loan debts, (ii) this state of affairs will persist for a significant portion of the repayment period, and (iii) good faith repayment efforts. Failure to prove any factor renders the debt non-dischargeable. "We prefer a less restrictive approach to the 'undue hardship’ inquiry.” Long, 322 F.3d at 554. Some circuits have adhered to or adopted the Brunner test after considering our approach. See Educ. Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1308-09 (10th Cir.2004). Only our court en banc or the Supreme Court could resolve this conflict, which may not be that significant.

. The Department of Education describes the ICRP as a plan that allows a borrower "to meet your Direct Loan obligations without causing undue financial hardship.” Repayment Plans, Federal Student Aid, http://www. ed.gov/offices/OSFAP/DirectLoan/RepayCalc/ dlindex2.html (last visited May 11, 2009).