# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 10-6017
_____

| | | |
|---|---|---|
| In re:  Kellie K. Sederlund, also known as Kelly K. Sederlund, | * * * | |
| Debtor | * * | |
| Kellie K. Sederlund, also known as Kelly K. Sederlund, | * * * * | Appeal from the United States Bankruptcy Court for the District of Minnesota |
| Plaintiff - Appellant | * * | |
| v. | * * | |
| Educational Credit Management Corporation | * * * | |
| Defendant - Appellee | * | |

_____

Submitted:  September 22, 2010
Filed: November 1, 2010
_____

Before FEDERMAN, VENTERS and NAIL, Bankruptcy Judges

FEDERMAN, Bankruptcy Judge

Debtor Kellie K. Sederlund appeals from the Order of the Bankruptcy Court[1] holding that her student loans should not be discharged pursuant to 11 U.S.C. § 523(a)(8). For the reasons that follow, we AFFIRM.

FACTUAL BACKGROUND

Debtor Kellie K. Sederlund is forty-two years old. She has no physical, mental, or psychological disability. She began her college education in 1986 and, in March 1992, earned a Bachelor of Arts degree in Psychology from the University of Minnesota - Twin Cities. Although she worked throughout college, she funded her education, in part, through student loans. In March 1992, she consolidated all of her student loans, in the amount of $16,649.70, with Sallie Mae Loan Servicing Association. Over the next twelve years, she paid a total of $11,825.10 against the student loans. Her last payment was in 2004. Since that time, she has received forbearances and economic hardship deferments from the loan holders. ECMC now holds the consolidated loan, which totaled approximately $47,000 at the time of trial.

As discussed in more detail below, the Debtor never obtained employment in her field of study, but has held several jobs over the years, mostly at law firms and with the food service industry. She has also had periods of unemployment. The Debtor is unmarried and has no children or dependents. Since 2004, the Debtor has lived with her boyfriend, who pays more than half of their household expenses.

The Debtor filed a Chapter 7 bankruptcy petition on December 11, 2008, and received a general discharge on March 13, 2009. On March 2, 2009, she filed an adversary proceeding seeking to have her student loans discharged. Following a trial, at which the Bankruptcy Court announced its findings and conclusions, the Bankruptcy Court entered judgment in favor of Defendant ECMC, holding that the

---

[1] The Honorable Nancy C. Dreher, Bankruptcy Judge, United States Bankruptcy Court for the District of Minnesota.

Debtor had not met her burden of proving undue hardship, so the loans are not dischargeable under § 523(a)(8).  The Debtor appeals.

<u>STANDARD OF REVIEW</u>

"Undue hardship 'is a question of law which we review *de novo*.  Subsidiary findings of fact on which the legal conclusion is based are reviewed for clear error.'"[2]

<u>UNDUE HARDSHIP</u>

Dischargeability of student loans is governed by § 523(a)(8) of the Bankruptcy Code, which provides, in relevant part, that a discharge under § 727 does not discharge an individual debtor from any debt for student loans, "unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents . . . ."[3]   In making a determination of undue hardship, the Bankruptcy Court may properly consider the circumstances as they exist at the time of trial.[4]

The Eighth Circuit has adopted a totality-of-the-circumstances test in evaluating undue hardship in student loan cases:

---

[2]  *Educational Credit Mgmt. Corp. v. Jesperson*, 571 F.3d 775, 779 (8th Cir. 2009) (*quoting In re Reynolds*, 425 F.3d 526, 531 (8th Cir. 2005)).

[3]  11 U.S.C. § 523(a)(8).  "In contrast to many other types of debts, § 523(a)(8)'s exclusion of student loans from discharge is 'self-executing' in the sense that, 'unless the debtor affirmatively secures a hardship determination, the discharge order will not include a student loan debt.'"  *Walker v. Sallie Mae Serv. Corp. (In re Walker)*, 427 B.R. 471, 476 (B.A.P. 8th Cir. 2010) (quoting *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 450, 124 S.Ct. 1905, 1912, 158 L.Ed.2d 764 (2004)).

[4]  *Walker v. Sallie Mae*, 427 B.R. at 483-84.

We apply a totality-of-the-circumstances test in determining undue hardship under § 523(a)(8). Reviewing courts must consider the debtor's past, present, and reasonably reliable future financial resources, the debtor's reasonable and necessary living expenses, and "any other relevant facts and circumstances." The debtor has the burden of proving undue hardship by a preponderance of the evidence. The burden is rigorous. "Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt-while still allowing for a minimal standard of living – then the debt should not be discharged."[5]

We start, in this case, with the Debtor's expenses. In the Eighth Circuit, in order to be reasonable and necessary under § 523(a)(8), an expense must be "modest and commensurate with the debtor's resources."[6] The Bankruptcy Court found the Debtor's expenses to be moderate and neither party contests that finding. Rather, the dispute here centers around the Bankruptcy Court's findings that (i) the boyfriend's contributions to the household expenses should be considered in determining whether the Debtor can pay the student loans while still allowing for a minimal standard of living; (ii) the Debtor is voluntarily underemployed; and (iii) the Debtor is eligible for an income contingent repayment plan under which she will be able to maintain a minimal standard of living.

As stated, the Debtor has a Bachelor of Arts in Psychology. She has no professional licenses or certifications and she has never obtained employment in her field of education. Instead, since graduating from college, the Debtor has had somewhat sporadic employment as a secretary and word processor for law firms, and, most recently, as a butler for a catering company. According to the statement from

---

[5] *Jesperson*, 571 F.3d at 779 (*citing In re Long*, 322 F.3d 549, 554-55 (8th Cir. 2003)) (footnote omitted).

[6] *Id.* at 780.

4

the Social Security Administration admitted into evidence at trial, the Debtor's taxed earnings for the years 1992 (the year she graduated) to 2003 were as follows:

| | |
|------|------|
| 1992 | $12,150 |
| 1993 | $14,325 |
| 1994 | $9,100 |
| 1995 | $23,213 |
| 1996 | $8,969 |
| 1997 | $13,544 |
| 1998 | $19,541 |
| 1999 | $23,595 |
| 2000 | $30,860 |
| 2001 | $28,600 |
| 2002 | $32,944 |
| 2003 | $28,502[7] |

The parties stipulated that her income from 2004 to 2009 was as follows:

| | |
|------|------|
| 2004 | $6,601 |
| 2005 | $5,930 |
| 2006 | $9,180 |
| 2007 | $5,316 |
| 2008 | $12,635 |
| 2009 | $6,506[8] |

With the exception of 2008, each of these annual incomes since 2004 fell below the poverty level established by the United States Health and Human Services.[9]

---

[7] Plaintiff's Ex. 4.

[8] *Stipulation of Uncontroverted Facts*, Appendix for the Appellee's Brief, at 185.

[9] *Id.*

Viewed in isolation, one might view the Debtor's recent history of income below the poverty level as supporting a finding of undue hardship. However, the Bankruptcy Court found two reasons why it does not in this case.

First, as the Bankruptcy Court held, the Debtor's long-time, live-in boyfriend pays more than half of the couple's household expenses. Courts have held it proper to consider a spouse's income in the undue hardship analysis.[10] The Debtor asserts that the Bankruptcy Court erred in considering her boyfriend's contributions to the household income, pointing to the fact that they have no written or oral agreement as to who pays expenses. The boyfriend did not testify. Although the Debtor testified that she did not consider the relationship to be "stable," she also appeared to concede that her relationship was no less "stable" than a marriage might be.[11] Further, there was no evidence that the couple had ever separated in the past six years, or that either

---

[10] *See In re Walker*, 427 B.R. at 484 n. 40 (holding that the bankruptcy court was correct in considering the debtor's spouse's income, which was the sole household income, in determining undue hardship); *Sweeney v. Educ. Credit Mgmt. Corp. (In re Sweeney)*, 304 B.R. 360, 362-63 (D. Neb. 2002) ("Overwhelming authority requires that a court consider the spouse's income. This Court finds no published opinion of a court that holds to the contrary."); *Collins v. Educ. Credit Mgmt. Corp. (In re Collins)*, 376 B.R. 708, 714 (Bankr. D. Minn. 2007) ("A court must consider a spouse's income in deciding whether a student loan constitutes an undue burden . . . . For reasons of sound authority and sound public policy, the court must view undue hardship in light of the total income of the family.") (citation omitted); *Shadwick, v. U.S. Dept. of Education (In re Shadwick)*, 341 B.R. 6, 11 (Bankr. W.D. Mo. 2006) ("In addition to the current and prospective income of the Debtor, the Court must consider the income or earning potential of the Debtor's spouse.") (citations omitted). *But see Reynolds v. Penn. Higher Educ. Assistance Agency (In re Reynolds)*, 425 F.3d 526, 535 (8th Cir. 2005) (Bright, J., concurring) (stating that, since the student loans were incurred prior to the marriage, and each spouse contributed equally to the household, that should be taken into account).

[11] *Transcript of Proceedings* at 111:

> Q:     Would you describe the relationship as being stable?
>
> A:     No because half the time I'm saying that I want to leave. I mean, I – when you're not married it's – well, I suppose if you are married, it can be unstable, but no, I would not.

of them had any actual intention to leave the relationship. Since the evidence was that the couple has been cohabiting with the same financial arrangement for six years, and the Debtor's characterization of the relationship as other than stable was vague and self-serving under the circumstances, we conclude that the Bankruptcy Court did not err in finding that the relationship was a joint economic unit similar to a marital relationship, that the boyfriend was likely to continue to contribute to the household finances in the same manner into the future, and that his contributions should be considered as part of the household income.[12]

Second, even without considering the boyfriend's contributions, the Bankruptcy Court found that the Debtor is voluntarily underemployed. The Court found the Debtor to be "pretty sophisticated" and that she represented herself well at trial, including reading and understanding case law on the subject of discharging student loans and correctly using legal jargon. The Court found that the Debtor has held good jobs at law firms, and there was no evidence that the Debtor lost any of her jobs due to lack of performance or inability to do the work. Instead, the evidence supported the Court's finding that she simply quit most of the jobs because she did not like them.

Specifically, the Debtor testified that she worked at the law firm of Reif & Gregory from October 1987 to April 1995.[13] She quit that job because she had accepted a position to train to be a claims adjuster at Lincoln National Insurance. In 1996, she quit the job at Lincoln National Insurance because she "got in an argument with [her] boss because they were picking on this lady that worked there," and because she did not like insurance. At some point, she got a job at the Hennepin County probation office, where she worked for three months. However, the

---

[12] In the event that the couple were to split, or if the boyfriend stopped contributing to the household finances, we have previously said that a debtor may, under certain circumstances, file a new action to discharge student loans based on changed circumstances. *See In re Walker*, 427 B.R. at 481.

[13] Part of this period was while she was still in college. She graduated in 1992.

supervisors there were "very abusive and they had outdated attitudes," they wanted the employees to time in and out when they went to the bathroom, they yelled at the employees on one occasion, and they treated the employees like they were one of the parolees. She quit that job because it was too stressful and she "couldn't handle the abuse." After several months of unemployment, she then got a job doing night secretarial work at the law firm of Bassford and Lockhart, where she worked for about six months in 1997. She quit that job because, after she had gotten into an argument with one of the day secretaries, the firm wanted to change her from night hours to day hours, and she did not think that was a good idea. She testified that she quit because she "didn't like it there." She then worked as a temporary secretary at several places between 1997 to 2000, but none of those employers offered her a permanent position. In 2000, she got a permanent job with the law firm of Winthrop & Weinstine as a night word processor, earning as much as $22.50 per hour. She was terminated in October 2003 following a dispute with a co-worker over hours. She was initially denied worker's compensation benefits because it was determined that she was terminated for misconduct for, essentially, failing to attend a meeting to resolve the conflict with the co-worker. However, she appealed that decision and prevailed on appeal.[14]

She was then unemployed until April 2005, when she began working as a butler (server) for Wolfgang Puck's catering division, now known as Compass Group USA, Inc. She continues to work for Compass Group USA as a butler. She is paid an hourly wage of $14 per hour and the number of hours she works varies. She testified that her hours are currently low due to a downturn in the catering business and the economy in general. Despite this downturn, she is not currently looking for "office jobs," but instead is only applying for food service jobs.[15]

---

[14] Tr. at 87-106; Plaintiff's Ex. 9.

[15] Tr. at 87-106.

The Debtor asserts that her difficulty in getting and keeping jobs is due to age, race, and/or gender discrimination. She is a forty-two year old, Korean-American woman. This discrimination, she asserts, extends to her current position with the Compass Group catering company and is the reason why she has never been promoted to captain, which earns a higher hourly wage than butlers make. However, her theory of widespread discrimination is, essentially, speculation – she presented no evidence of any actual discrimination by any of the former or potential employers, nor did she ever file a formal complaint with any of her employers or with the EEOC.[16] Indeed, she repeatedly, and candidly, conceded that she probably lost many of her jobs because she complains a lot and has been labeled a troublemaker.[17] In sum, there simply was no evidence to support the Debtor's allegation that her lack of income was due to age, race, or gender discrimination, and the Bankruptcy Court did not err in so finding.

The Debtor also points to the current economic recession to support her argument that her loans should be discharged. However, as the Court pointed out, there is no way of knowing how long this, or any, recession will last. Moreover, as ECMC's counsel pointed out in closing argument, the current economic climate cannot be a basis for meeting the high standard for dischargeability because everyone is in this recession together.

---

[16] In her Brief, the Debtor recounts specific instances when people made race-based offensive comments to her as she was growing up and in college. *See, e.g.,* Appellant's Brief at 11-12. She also brought up at trial a perception that opportunities for actresses and women over age 40 "tend to peter out." *See* Tr. at 62-64. However, she testified to no instance where an employer or potential employer discriminated against her due to any protected reason, or even made an offensive comment to her based on her race, age, or gender. Instead, she assumes that adverse actions are taken against her because of her race, age, or gender, likely due in part to her experiences growing up. However, despite her strong feelings of past prejudice, the Bankruptcy Court was required to rely on actual evidence, and there simply was none showing that the Debtor is unable to maintain suitable employment based on her race, age, or gender.

[17] *See, e.g.,* Tr. at 65-66, 69-70, 71, 74; Appellant's Brief at 46-48.

"A debtor is not entitled to an undue hardship discharge of student loan debts when his current income is the result of self-imposed limitations, rather than lack of job skills . . . ."[18] The evidence and testimony support the Bankruptcy Court's conclusion that the Debtor is entirely capable of obtaining full-time, gainful employment, and that she is voluntarily underemployed. Therefore, she failed to prove that she should be entitled to discharge her student loans.

Finally, the Eighth Circuit Court of Appeals confirmed in *Jesperson* that the Income Contingent Repayment Plan for student loans, which, the parties concede, is available to the Debtor, is a factor to be considered in evaluating the totality of the debtor's circumstances:

> [U]ndue hardship under § 523(a)(8) continues to require separate analysis under which, in this circuit, the ICRP is "a factor" to consider in evaluating the totality of the debtor's circumstances. However, a student loan should not be discharged when the debtor has "the ability to earn sufficient income to make student loan payments under the various special opportunities made available through the Student Loan Program."[19]

"Although some question remains as to the weight to be given to the ability to make an ICRP payment following *Jesperson*, the Eighth Circuit made clear that the ability to do so is, at a minimum, an important factor in the analysis."[20]

---

[18] *In re Jesperson*, 571 F.3d at 782.

[19] *Id.* at 781 (citations omitted).

[20] *In re Walker*, 427 B.R. at 486-87 (citing *In re Jesperson*, 571 F.3d at 784 (Smith, J., concurring) (stating that, while the ICRP is a factor relating to good faith in the analysis, a bankruptcy court should not place too much weight on the debtor's refusal to enroll in the ICRP), *Id.* at 786 (Bye, J., dissenting) (stating that a debtor is not ineligible for a hardship discharge if capable of making payments under the ICRP)).

The undisputed evidence was that the Debtor's loans qualify for the William D. Ford Federal Direct Loan Program and that, under either the Income Contingent Repayment Plan or the Income Based Repayment plan, at her current income level, her student loan payments would be zero.[21] The Debtor stated that she had not applied for either of these repayment plans because she believes there will be tax consequences. As the Bankruptcy Court stated, however, while there is some question as to whether borrowers whose student loans are forgiven are subject to tax liability, the Eighth Circuit in *Jesperson* appeared to reject the argument that such potential tax liability is a basis for a finding of undue hardship under § 523(a)(8).[22]

Finally, the Debtor asserts that the Bankruptcy Court made a "hasty" decision because she made her findings and conclusions from the Bench at the conclusion of the trial. However, courts frequently announce findings and conclusions from the Bench and doing so does not mean that the Court hastily considered the evidence. The transcript shows that the Court in this case carefully considered the evidence and the law and made detailed findings based on those items. Indeed, the Debtor has pointed to no specific item of evidence which was overlooked, nor any error in determining the law to be applied.

CONCLUSION

Because we conclude that the Bankruptcy Court did not err in finding that the Debtor failed to meet her burden of showing that repaying her student loans

---

[21] *Stipulation of Uncontroverted Facts* at 5-6, Appendix for the Appellant's Brief at 187-88.

[22] *Jesperson*, 571 F.3d at 782 (disagreeing with the bankruptcy court and district court's view of the ICRP as being inimical to the goals of the fresh start because the ICRP allows for negative amortization and a potentially significant tax bill when the loans are forgiven, and pointing out that a tax obligation would only arise if the borrower has assets exceeding the amount of debt being canceled).

would impose an undue hardship on her pursuant to 11 U.S.C. § 523(a)(8), the Judgment is AFFIRMED.