# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2032

_____

| | | |
|---|---|---|
| In re: Michele D. Walker, | * | |
| | * | |
| Debtor. | * | |
| | * | |
| _____ | * | |
| | * | |
| Michele D. Walker, | * | |
| | * | |
| Plaintiff/Appellee, | * | Appeal from the United States |
| | * | Bankruptcy Appellate Panel |
| v. | * | for the Eighth Circuit. |
| | * | |
| Sallie Mae Servicing Corp.; SLM | * | |
| Education Credit Finance Corporation; | * | |
| Kohn Law Firm, S.C.; Zwicker & | * | |
| Associates, P.C.; Sallie Mae, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| Educational Credit Management | * | |
| Corporation, | * | |
| | * | |
| Defendant/Appellant. | * | |

_____

Submitted: December 15, 2010
Filed: August 18, 2011

_____

Before WOLLMAN, MURPHY, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

The Educational Credit Management Corporation (ECMC) appeals from the judgment of the bankruptcy court, later affirmed by the Bankruptcy Appellate Panel (BAP), which discharged the student loan debt of Michele D. Walker (Walker) under the "undue hardship" provision of 11 U.S.C. § 523(a)(8). We affirm.

I.

We summarize the relevant facts as outlined in Walker v. Education Credit Management Corp., 427 B.R. 481 (8th Cir. B.A.P. 2010). Walker accumulated student loan debt to fund her undergraduate education at the University of Illinois, from which she graduated in 1989. She completed a medical school preparatory program at Creighton University and then enrolled in the University of Illinois College of Medicine. After her second year of medical school, Walker failed her initial state licensing exam and was dismissed. When her appeals for reentry were denied, Walker worked as a pharmacy technician and substitute teacher. She met Troy Walker, a police officer, and married him in 1996. She entered a master's program at Governor State University in 1997, graduating with a degree in school psychology in 2000. She funded this part of her education with private loans that are not implicated in her discharge petition.

The Walkers have five children —the oldest born in 1998, one set of twin boys born in 2000, and a second set of twins born in 2001. In 2002, the Walkers moved from Chicago, Illinois, to Minneapolis, Minnesota, where Walker began a full-time post-graduate internship as a school psychologist with the Minneapolis Public Schools, earning between $16,000 and $17,000 annually. Walker worked for the school district for another year, but was unable to continue because her position was cut. After her internship ended, Walker cared for her children, devoting much of her time to the older set of twins, who had been diagnosed with autism in 2003.

In 2004, the Walkers moved from Minneapolis to Hudson, Wisconsin, where they remain. Troy retained his position with the Minneapolis police department and moonlighted as a security officer during his off hours. Walker has not worked outside of the home since 2004. She filed a Chapter 7 bankruptcy petition in April 2004 and received her discharge three months later. That discharge had no effect on her student loan debt because she did not seek an undue hardship determination until 2007, when she initiated this proceeding. By that time, her five children were attending Wisconsin public schools, including the autistic twins, who have been mainstreamed.

In 2008, the autistic twins were accepted into the Wisconsin Early Autism Project, a state-funded program of intensive, in-home therapy for children with autism that entailed eight to nineteen hours during the week, plus eight hours each Saturday and Sunday. A parent must be present for the therapy sessions, and Walker fulfilled that obligation. In addition, she spent about two hours per day preparing for the session and remained available to respond to calls from the school if either of the autistic twins had a "meltdown" at school. Setting aside time to care for the twins or to respond to calls from their school made it difficult for Walker to keep a regular schedule that would permit her to work outside the home, even on a part-time basis. Additionally, because the older twins are eligible for full participation in the state-funded autism program for only a three-year period, Walker anticipates that their total session time will be reduced to ten to twenty hours per month at some point in 2011.

From 2004 to 2007, the Walkers' combined adjusted gross income, derived exclusively from Troy's employment, ranged from $59,019 to $67,639. In 2007, Walker enrolled in an associate's degree program to become a registered nurse, with the aim of earning supplemental income. She left the program after one semester, however, because she could not care for her children and attend school at the same time. The Walkers incurred two sizeable debts during this period that are relevant to our analysis below. In 2005, they took out a $50,000 home equity loan, $30,000 of which went to build a screened-in deck on their home in Wisconsin, with a monthly

payment of $373.52. In 2007, Troy purchased a new Chevrolet Suburban for $40,000, with a monthly payment of $850. At that time, the family owned a 1998 minivan, a 2004 minivan, and a 1998 sedan that had been loaned to Walker's mother.

In 2007, Walker filed an adversary proceeding seeking to discharge roughly $300,000 in student loan debt under the undue hardship provision of § 523(a)(8) of the Bankruptcy Code. The parties agree that Walker is eligible for enrollment in the Ford Program's Income Contingent Repayment Plan (ICRP), set forth in 34 C.F.R. § 685.209. They also agree that based on a household adjusted income of $67,639 and a family of seven, Walker would have a monthly payment of $593.98 under the ICRP.

## II.

We review *de novo* whether excepting a debtor's student loan debt from discharge constitutes an undue hardship. Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 553 (8th Cir. 2003). We review for clear error the subsidiary findings of fact on which this legal conclusion is based. Reynolds v. Pa. Higher Educ. Assistance Agency, 425 F.3d 526, 531 (8th Cir. 2005). We will not upset those findings of fact unless, after reviewing the entire record, we are left with the definite and firm conviction that a mistake has been made. Cumberworth v. U.S. Dept. of Educ. (In re Cumberworth), 347 B.R. 652, 657 (8th Cir. B.A.P. 2006).

Section 523(a)(8) of the Bankruptcy Code provides that debts from educational loans "made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit," may not be discharged unless "excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents." The debtor has the burden of establishing undue hardship by a preponderance of the evidence. To assess whether the debtor has met this burden we apply a totality-of-circumstances test, under which we consider (1) the debtor's past, present, and reasonably reliable future financial resources; (2) a

calculation of the reasonable living expenses of the debtor and her dependents; and (3) any other relevant facts and circumstances surrounding the particular bankruptcy case.  In re Long, 322 F.3d at 554.

ECMC raises three claims on appeal.  First, it contends that the bankruptcy court erred in considering Walker's financial circumstances at the time this § 523(8) proceeding commenced in 2008.  In its view, the undue hardship analysis must be made on the evidence as it stood at the time of initial Chapter 7 discharge in 2004. Second, it claims that Walker failed to prove undue hardship by a preponderance of the evidence and that the bankruptcy court overcame gaps in the record by making impermissible inferences about Walker's financial resources and expenses.  Third, it claims that the bankruptcy court erred in finding that Walker's household expenses were "modest and commensurate" with a minimal standard of living.  It contends that the Walkers' expenses are unreasonable as a matter of law so as to preclude an undue hardship determination.

A.  Temporal Scope of Undue Hardship Analysis

ECMC maintains that the bankruptcy court committed clear error in looking beyond 2004 when calculating Walker's expenses and income.  It contends that "the factual question is whether there is an undue hardship at the time of discharge, not whether there is an undue hardship at the time that a § 523(a)(8) proceeding is commenced."  Bender v. Educ. Credit Mgmt. Corp., 368 F.3d 846, 848 (8th Cir. 2004).  But this precept arose from, and is to be applied in, a factual context much different than that which exists here.

Bender involved a Chapter 13 debtor who sought an undue hardship determination before she completed her Chapter 13 plan.  At issue was whether the debtor's § 523(8)(a) petition was ripe for adjudication when filed three and a half years before discharge could occur.  We observed that the prospective evaluation of

a Chapter 13 debtor's future capacity to repay student loan debt would "require some degree of judicial prescience," the exercise of which was both impractical and unnecessary.  Id.  We reasoned that "such proceedings should take place relatively close to [the discharge] date so that the court can make its determination in light of the debtor's actual circumstances at the relevant time," held that the petition was not ripe, and affirmed its dismissal.  Id.

The operative rule in Bender has no application here.  Neither the bankruptcy court nor the BAP was speculating about Walker's prospective financial condition; both courts were assessing her financial activity from the preceding four years.  The risks associated with the exercise of "judicial prescience" are thus absent here.  It would make little sense to require that the court ignore what actually occurred after Walker's Chapter 7 discharge in order to comply with a rule that was crafted to assure that a court "can make its determination in light of the debtor's actual circumstances at the relevant time," i.e., the time of the undue hardship determination.  Id.  Indeed, to ask the court to ignore what occurred in Walker's life after 2004 would be inconsistent with the first prong of the totality-of-circumstances test, which instructs a fact-finding court to consider "the debtor's past, present, and reasonably reliable future circumstances."  In re Long, 322 F.3d at 554.

ECMC's invocation of In re Woodcock, 326 B.R. 441 (B.A.P. 8th Cir. 2005) lends no support to its argument.  Woodcock involved a Chapter 7 debtor who sought reconsideration of an order denying a discharge on the basis of undue hardship.  As the BAP noted, the debtor sought relief via a Rule 60(b) motion on the grounds that the passage of time showed that his circumstances had not improved, which purportedly indicated that the bankruptcy court erred in denying discharge.  Id. at 447.  The holding—that the judgment of nondischargeability was a final judgment not subject to collateral attack based on a claim that debtor's circumstances had failed to improve—does not support ECMC's argument for a limited temporal scope of undue

hardship review. Accordingly, we hold that it was not clear error to consider Walker's financial condition from 2004 through 2007 in the undue hardship analysis.

### B. Net Income Calculations

ECMC complains that Walker produced no evidence related to Troy Walker's part-time income, leaving an unspecified amount of income unaccounted for. It also maintains that the bankruptcy court committed clear error when it applied 2007 income tax and payroll deductions to adjusted gross income figures from 2004 to 2007. Finally, ECMC contends that the bankruptcy court exacerbated this error by subtracting certain tax liabilities from the stipulated adjusted gross income figure, which amounted to a double-counting of deductions and artificially reduced the net income calculation. ECMC asserts that this method of calculating net income taints the overall analysis because it is based on mere speculation and relieves Walker of her burden of proving undue hardship by a preponderance of the evidence.

We ground our review on income figures to which both parties stipulated. Because ECMC stipulated to these figures, we reject its claim that it was clear error not to calculate and include income from Troy Walker's part-time work. The parties stipulated that the Walkers' adjusted gross income in 2007 was $67,639.[1] This leaves a monthly adjusted gross income of $5,636.58. The BAP found no error in the bankruptcy court's method of using the Walkers' actual federal and state tax liability for 2007, rather than taking the sum of income tax withholdings from Troy's paychecks and then accounting for the Walkers' income tax refund. When averaged over twelve months, the monthly income tax obligation was $372. We agree that this was not error and thus adopt this figure for our analysis. We question, however, the

---

[1]The BAP appears to have transposed a number in its calculation when it concluded that the parties had stipulated to a 2007 adjusted gross income of $67,939. The record reflects that the actual stipulation reads "$67,639." A-134, at ¶ 6.

manner in which both the bankruptcy court and the BAP treated additional voluntary withholdings from Troy's 2007 paystubs.

The paystubs indicate automatic payroll deductions in the amount of $934.10 for items such as retirement, deferred compensation, medical insurance, life insurance, and pension. These paystubs were admitted into the record without explanation from Walker and were not challenged by ECMC at trial. Both the bankruptcy court and the BAP added the sum of the payroll deductions to the tax liability to reach a total withholding of $1,306.10 and subtracted this sum from their respective gross monthly income calculations to arrive at a net monthly income. At no point did either court acknowledge that it had subtracted the income tax liability and payroll deductions from the 2007 adjusted gross income figure to which both parties stipulated. In other words, both courts treated as monthly gross income a figure the parties stipulated to be monthly adjusted gross income. This conflation is problematic because the adjusted gross income figure may account for at least some of the payroll deductions on the paystub, e.g., retirement, deferred compensation, and employee contribution to a medical insurance premium. See 26 U.S.C. § 62(a) (defining adjusted gross income as gross income minus the sum of the above-the-line deductions, including retirement savings and health-saving accounts).

Because we have a stipulated gross adjusted income figure, not the tax return itself, we cannot compare the 2007 tax return with the payroll stub to discern which, if any, deductions on the payroll stub were also claimed as above-the-line deductions. On this record, it is impossible to discern whether double-counting did in fact take place. ECMC is of little help, because it failed to challenge the paystub evidence at trial, failed to address the issue of double-counting when it appeared before the BAP, and failed to specify on appeal which specific payroll deductions it believed may have been double-counted.

We recognize that "a court may not engage in speculation when determining net income and reasonable and necessary living expenses." Educ. Credit Mgmt. Corp. v. Jesperson (In re Jesperson), 571 F.3d 775, 780 (8th Cir. 2009). In Jesperson, the bankruptcy court credited testimony from the debtor regarding his federal income tax obligation that was patently false, which had the effect of understating the debtor's income. The bankruptcy court also concluded that the debtor's housing expenses were $1000 per month, when the evidence showed that the debtor lived rent-free with his brother and had worked out an agreement under which he could continue to do so for $500 per month. We concluded that the bankruptcy court had clearly erred in both determinations and thus reversed the undue hardship determination. Similarly, in In re Rose, 324 B.R. 709 (8th Cir. B.A.P. 2005), the BAP concluded that the bankruptcy court committed clear error by ignoring more than $260 in monthly disposable income and by giving undue weight to the mere possibility that debtor might need a new car or the possibility that her roommate might move out, thereby doubling her housing costs. Id. at 713. These possibilities did not rise to the level of "reasonably reliable facts and circumstances" and could not serve as the basis of the bankruptcy court's legal conclusion. Id.

The degree of speculation evident in Jesperson and Rose is absent here. The BAP did not substitute assumptions or speculation for reasonably reliable facts, nor did it accept an income figure that was patently false or give undue weight to changes in the debtor's life circumstances that had not yet occurred. Rather, it employed a method that posed a risk of double-counting in determining the debtor's net monthly income. We reject ECMC's suggestion that employing this method is akin to impermissible speculation and we likewise reject the claim that it so taints the undue hardship analysis that it precludes discharge as a matter of law. Net income is but one factor in the analysis and is to be assessed relative to reasonable household expenses. Accordingly, the magnitude of the potential error can be evaluated only in the larger context of the totality-of-circumstances analysis.

If we exclude altogether the disputed payroll deductions of which ECMC complains, we subtract the monthly federal and state income tax liability of $372 from the stipulated monthly gross adjusted income of $5,636.58 to arrive at a net monthly income of $5,264.58.[2] That figure is still less than the Walkers' monthly expenses of $5,913, leaving a monthly deficit of nearly $650. Thus, even when the payroll deductions are excluded, the expenses of the debtor and her dependents outstrip her available resources. ECMC responds that this deficit is illusory because the claimed expenses of Walker and her dependents are unreasonable as a matter of law.

C. Household Expenses

A debtor's household income must be used to satisfy reasonable and necessary expenses. In re Jesperson, 571 F.3d at 779. "To be reasonable and necessary, a debt must be 'modest and commensurate with the debtor's resources.'" Id. at 780 (quoting In re Debrower, 387 B.R. 587, 590 (Bankr. N.D. Iowa (2008)). "[I]f the debtor's reasonable financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged." In re Jesperson, 571 F.3d at 779.

ECMC challenges as unreasonable the monthly car payment of $850 on the 2007 Chevrolet Suburban SUV and the monthly payment of $373.52 on the $48,000 second mortgage, of which, as set forth earlier, $30,000 was used to build the deck porch. ECMC points out that the monthly payment on the Suburban alone exceeds the monthly payment of $593.98 that Walker would pay on her student loan debt under the ICRP and questions the need to purchase a new vehicle when the family owned two other mini-vans and had loaned its sedan to Walker's mother.

_____

[2] By ignoring the paystub withholdings entirely, we assume that each voluntary deduction on the paystub had already been accounted for in the gross adjusted income figure. If anything, this approach favors ECMC and attributes to the Walkers a higher net monthly income than might otherwise be justified.

Both the bankruptcy court and the BAP were troubled by the cost of these two items, as are we. Yet we also recognize that the porch and the Suburban fulfill important functions in the daily life of this family of seven. Moreover, because "fairness and equity require each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy," In re Long, 322 F.3d at 554, we consider these expenses in light of the overall financial and interpersonal context of Walker's household.

As outlined above, even if we exclude all the payroll deductions when calculating net income, the Walkers run a deficit of nearly $650 per month. Aside from challenging specific expenses as unreasonable, ECMC did not rebut the findings of fact on which this calculation is based, nor did it identify a scenario under which Walker could realistically increase the household's income. Even if the family had chosen a more modest vehicle or had not added a deck to the home, it is unrealistic to expect that Walker could meet her minimum ICRP payment of $593.98 in light of the monthly household deficit in excess of that amount.

Though we may question the wisdom of the particular purchases at issue, we also recognize that "the minimal standard of living" for Walker must account for the size of her family and the special needs of her two autistic children. On the basis of the record before us, we agree with the BAP's conclusion that "the reality of the Walkers' budget is that Michele cannot afford to make any payments on her student loans and still maintain a minimal standard of living. That circumstance, based on the evidence offered, is likely to continue for many years . . . ." In re Walker, 427 B.R. at 487.

This is not a case in which a debtor willfully chose to avoid payments that could have been made or was underemployed or unemployed for no discernible reason. Caring for her five young children has become Walker's full-time occupation. Both the bankruptcy court and the BAP determined that it was unlikely that Walker would

be able to work until the older twins reached the age of majority, if at all, and noted that the staleness of her education at that time would limit her employment options. We agree that, in light of the overall circumstances of this case, excepting Walker's student loan debt from discharge would impose an undue hardship on her.

The judgment is affirmed.

COLLOTON, Circuit Judge, concurring in the judgment.

The apparent contradictions in this case are troubling. Michele Walker could satisfy her student loan debt of $283,354.50 by making monthly payments of $593.98 under the Department of Education's Income Contingent Repayment Plan ("ICRP"). *See Educ. Credit Mgmt. Corp. v. Jesperson* (*In re Jesperson*), 571 F.3d 775, 782 (8th Cir. 2009). At the same time, she and her family are making monthly payments of $850 on her husband's purchase of a new 2007 Chevrolet Suburban with leather seats and a DVD player, at a cost of approximately $40,000. *See Walker v. Sallie Mae Servicing Corp.* (*In re Walker*), 406 B.R. 840, 857 & n.33 (Bankr. D. Minn. 2009). The Walkers also make monthly payments of $224.11 for that portion of a $50,000 second mortgage loan that they used to build a sixteen-by-twenty-two-foot screened deck onto their house. *See id.* at 857; R. Doc. 27, at 4. In total, the Walkers are paying $1074.11 monthly for the SUV and deck addition. Without those expenses, the same amount of funds would allow Walker to meet her student loan obligation under the ICRP, with $480.13 per month to spare. Yet the court concludes that even if the Walkers "had chosen a more modest vehicle or had not added a deck to the home, it is unrealistic to expect that Walker could meet her minimum ICRP payment of $593.98 in light of the monthly household deficit in excess of that amount." *Ante*, at 11. How can that be?

Educational Credit Management Corporation cries foul, but ECMC's own stipulations and forfeited objections in the bankruptcy court are the source of its

problem. Although it seems that the Walkers must be getting money from somewhere to pay $1074.11 per month for a new vehicle and a second mortgage, ECMC stipulated that the family's total adjusted gross income was $5636.58 per month in 2007, R. Doc. 27, at 4, and raised no objection to any other expenses on the monthly budget submitted by the Walkers. 406 B.R. at 856 & n.31; *see* App. 101. Thus, even correcting for the errors of the bankruptcy court and the Bankruptcy Appellate Panel in conflating adjusted gross income and gross income, *ante*, at 8, and giving the benefit of the doubt to ECMC that the BAP may have double-counted payroll deductions, *ante*, at 8, the stipulations and unchallenged numbers *still* result in a calculation that supports the discharge. If the SUV and mortgage payments attributable to the deck are excluded entirely, the Walkers have left-over income of $425.69 per month, which falls short of the minimum ICRP payment of $593.98. Without the help of the ICRP (which would permit cancellation of debt amounting to $105,160.50 plus interest after twenty-five years, *see* 34 C.F.R. § 685.208(k)(1), § 685.209(c)(4)(i)), it is hard to see how Walker ever could repay the student loans, and why the "fresh start" permitted by discharge should not apply. *Cf. Jesperson*, 571 F.3d at 782.

The Bankruptcy Appellate Panel declined to decide whether the bankruptcy court erred in concluding that the purchase of the SUV and the deck addition were reasonable and necessary expenses, *see* 427 B.R. at 487, and this court reserves judgment on that question as well. *Ante*, at 11. In view of the income and expenses figures for 2007 that were established by ECMC's litigating positions in the bankruptcy court, and properly considered by the court, *see ante*, at 5-7, I concur in the judgment.

_____